[No. 31890. Department One. May 29, 1952.]

R. H. HARRINGTON, *Respondent and Cross-appellant*, v. D. C. RICHESON *et al., Appellants.*[1]

[1]Reported in 245 P. (2d) 191.

*Lenihan & Ivers,* for appellants Hendrickson and Los Angeles-Seattle Motor Express, Inc.

*Metzler, McCormick & Metzler,* for appellants Larson and Richeson.

*Nixon & Hove,* for respondent and cross-appellant.

DONWORTH, J.—This action was brought to recover damages suffered as the result of an alleged conspiracy conceived and executed by defendants. Plaintiff alleged that by concerted acts defendants had seized possession of, and had forced him to sell for less than their true value, a certain truck and trailer.

The action was tried to the court sitting without a jury. At the conclusion of the trial, the court announced its oral decision for plaintiff, saying in part:

"I am of the opinion that the acts of the named defendants amount to a conspiracy, whether by agreement or not, but I think you can infer an agreement."

Findings of fact, which followed substantially the allegations of the complaint, conclusions of law and judgment for plaintiff in the sum of $2,375 were subsequently entered. From this judgment all defendants have appealed. Plaintiff has taken a cross-appeal.

Appellants make thirteen assignments of error directed to the findings of fact, and assign error also to the court's overruling their demurrer, its denial of their motion for a dismissal at the close of respondent's case and its entry of judgment for respondent.

These several assignments of error, however, present but one question for determination: Is the finding that appellants' acts were performed pursuant to a scheme of conspiracy to obtain possession of respondent's truck and trailer without paying full value therefor contrary to the

weight of the evidence? Unless the evidence clearly preponderates against this finding, it will not be disturbed. *Coleman v. Davies*, 39 Wn. (2d) 312, 235 P. (2d) 199; *Batcheller v. Town of Westport*, 39 Wn. (2d) 338, 235 P. (2d) 471.

If we should find that the evidence preponderates against the finding as to the existence of a conspiracy, it will not be necessary for us to consider respondent's cross-appeal wherein he complains of the trial court's refusal to enter judgment for a larger sum.

We shall refer to Harrington hereinafter as respondent and to the individual appellants as Richeson, Larsen, and Hendrickson, respectively, and to Los Angeles-Seattle Motor Express, Inc., as the company.

The material facts are not greatly in dispute; the differences between the parties arise principally as to the inferences to be drawn from the facts.

Respondent, about March 10, 1947, purchased from an employee of the company for twenty thousand dollars a large 1946 Peterbilt truck (equipped with a Brown van thereon) and a Brown trailer. The American Trust Company of San Francisco financed the transaction by loaning to respondent approximately fifteen thousand dollars secured by a chattel mortgage covering the truck and trailer. Title to the equipment was in respondent, with the American Trust Company appearing as legal owner on the California registration certificate which was subsequently obtained.

The company is a Washington corporation which operates an auto freight line as a common carrier between Vancouver, B. C., and Los Angeles, California, loading and discharging freight also at certain way points. At the time this action was tried in May, 1951, it operated approximately one hundred trucks and trailers of the type owned by respondent, of which number almost one half were leased from their respective owners.

On March 10, 1947, respondent, by written instrument, leased the truck and trailer to the company for a period of one year, the lease agreement providing that the company

should have full and complete control of the truck and trailer, which should be subject to loading, routing, and schedule in the sole discretion of the company. The company also had the right, under the lease, to determine in its sole discretion the extent of repairs necessary to maintain the equipment in a roadworthy condition.

The company agreed to pay rental for the use of the truck and trailer at specified rates based upon the weight of freight hauled between its various terminals. From the amount of rental credited to the account of respondent the company was authorized to deduct and pay drivers' wages, liability and cargo insurance, road fees, taxes, licenses, fuel, repairs and other miscellaneous items. The company also had the right and the duty to paint upon the side of the truck "Los Angeles-Seattle Motor Express, Inc.," as required by the rules and regulations of this state.

Respondent and the company operated under this lease during its one year term. Respondent testified that during the term of the lease "they [the company] generally directed the road operation of the vehicle as to destination, and so forth, but most of the time I had my own repairs made where I wanted to have them made." He further testified that he and his driver drove the truck and that he controlled the hiring and firing of his driver.

The lease was not extended or renewed upon its termination on March 10, 1948, but respondent thereafter continued to haul freight for the company. He testified that the operation remained essentially the same except that his equipment was no longer licensed in Washington, that he thereafter terminated his northbound trips at Portland, Oregon, that he had full control of the truck and trailer and was free to accept or reject a load of freight tendered by the company.

In March, 1949, respondent, for personal family reasons, began to search for a prospective buyer of the truck and trailer, and in April, 1949, Larsen and Richeson, two Tacoma policemen, upon learning that the equipment was for sale, went to Portland to look at it. They expressed their interest

in buying it at respondent's asking price of $17,500, but indicated that they could make only a small down payment and that they would finance the transaction in Seattle, securing as large a loan as possible on the equipment. Respondent offered to hold their note for any difference.

In order that Larsen and Richeson might acquaint themselves with operation of the truck and trailer on the road, respondent invited them to accompany him on a trip to Los Angeles. Larsen accompanied respondent while Richeson went to Seattle to arrange the financing. On the second trip to Los Angeles respondent left the equipment at Woodland, California, in charge of his driver and Larsen and went to his home in Oakland, California. His wife was about to be confined and he was extremely anxious to be home during this time.

Respondent was unable, for the same reason, to rejoin his driver and Larsen on the return trip from Los Angeles. On the next trip. (about May 6, 1949) Larsen telephoned respondent from Woodland and was asked by respondent to send him $1,500. According to Larsen "he [respondent] said that if we would send him $1,500, from then on the truck was our baby and to start worrying." Respondent's version of this conversation was as follows:

"I told him to send me the $1,500 to protect me against any damages that might result, and if the deal went through—if they could finance it as they said they could, and if they did have the $3,000 that they represented they had, then his trips with the truck would start as of that date."

In any event, Larsen and Richeson forwarded $1,500 to respondent and continued driving the truck and trailer. They were paid drivers' wages, but all earnings of the equipment were credited to respondent's account with the company, and all expenses of operation, including drivers' wages, were charged to his account.

Respondent went to Seattle shortly before the end of May for the purpose of closing the deal. He then learned that Larsen and Richeson had not yet secured financing for their purchase of the equipment. Prior to this time Larsen and

Richeson had incurred a repair bill in excess of $900 caused by a rear end assembly on the truck burning out while on the road. Respondent and Larsen and Richeson do not agree as to whose fault occasioned this repair and their testimony also differs as to whether or not respondent agreed unconditionally to pay for the repair.

During the first two weeks of June respondent accompanied Larsen and Richeson to two banks and a finance company in Seattle in an effort to secure financing for the transaction. They were unable to secure a loan on the equipment and on June 18, 1949, they executed the following instrument:

"June 18-49

"In consideration of the sum of 3000.00 (Three thousand) down I agree to sell Peterbilt Truck # L 847 Motor # 54383 to Don Richeson and Rube Larsen, (including Brown trailer # 203 the agreement being leased to L. A.-Seattle Motor Express and known as 72 and 72 A.)

"The full price of equipment being $16,500.00 (sixteen thousand five hundred) Larsen and Richeson are to operate said truck in my name until such time as it is possible to refinance same, and all earnings of truck are to apply on purchase price.

"While operating truck it is to be only for L.A.-Seattle Motor Express as per usual lease agreement, and they are to draw no funds other than wages.

"No liens for repairs or upkeep greater than $250.00 are to be placed against equipment, with out authorization from me.

"I reserve the right to refinance as I am able, up to the amount of unpaid balance of purchase price.

"In the event truck does not show earnings of $800.00 per month for two consecutive months.

"I reserve the right to make such necessary changes in operation as will protect my investment.

"This agreement shall be for one year, renewable at that time.

"Until all payments are made, title to remain in my name, and it is expressly understood that this is a conditional sale, title not passing until final payments are made.

"R. Harrington

"The above agreed to this date.
"R. V. Larsen
"D. C. Richeson"

Shortly before the execution of this instrument on June 18th, Hendrickson, the general manager and vice president of the company, happened to see Larsen working on the equipment in Seattle and inquired of him what his interest in it was. Larsen told him about the purchase terms and that $1,500 had been paid to respondent. At that time Hendrickson advised Larsen to make no further payments to respondent except in his (Hendrickson's) office. Larsen immediately thereafter reported to respondent what Hendrickson had said. Respondent became very angry but later cooled down and decided not to talk to Hendrickson about the matter. Neither did Larsen indicate to respondent that he and Richeson would make no further payments upon the purchase price of the equipment except in Hendrickson's office.

According to Hendrickson, this conversation with Larsen, which took place about the middle of June, was the first notice that the company had that respondent was making a sale of his truck and trailer, although Hendrickson admitted on cross-examination that he knew in May that respondent was contemplating a sale of the equipment. In the middle of June respondent owed the company approximately $2,300.

Respondent testified that he first notified Hendrickson of his deal with Larsen and Richeson early in May, that about the end of May he assured Hendrickson that his account with the company would be paid before the sale was completed, and that he talked with Hendrickson on another occasion about the company's giving Larsen and Richeson a lease. In this latter regard he testified on cross-examination that the words "the agreement being leased to L. A.-Seattle Motor Express and known as 72 and 72A" were placed in the above quoted agreement "because at that time he [Hendrickson] had given them a lease . . . he had issued a lease to them for my truck."

In contrast to this testimony of respondent, Hendrickson, in his testimony, made no reference whatever to a lease between the company and Larsen and Richeson. He testified

that his next contact with respondent's transaction was when a series of repossessions of the equipment took place, as will presently be related. No lease between the company and Larsen and Richeson was offered in evidence.

Shortly before June 18th, according to Larsen and Richeson, they first became aware that respondent was indebted to the company and that the American Trust Company of San Francisco had a lien on the equipment. Respondent had by this time reduced his obligation to the American Trust Company to the approximate sum of $3,000.

In any event, Larsen and Richeson knew, when the agreement of June 18th was executed, that respondent was indebted to both the company and the American Trust Company, and that the latter had a chattel mortgage on the truck and trailer. At about the time the agreement of June 18th was made, Larsen and Richeson paid another $100 to respondent at his request. They were to send the remaining $1,400 due on the down payment to respondent the following week at his home in California. This they did not do, although respondent testified that he twice demanded payment. On Friday, July 1st, at 8:30 p. m., respondent sent the following telegram to Larsen and Richeson at their home in Tacoma:

"If money not received Sat. noon sending Danforth Portland to drive. You not authorized drive unless agreement fulfilled. Don't attempt trip. Starting legal action."

The Danforth referred to in the telegram was respondent's driver. He arrived in Portland sometime after July 1st, advised the dispatcher of the company that he was driving the truck and trailer, which were loaded with freight for San Francisco, and drove the equipment to San Francisco, arriving there July 4th. In testifying on cross-examination as to taking possession of the equipment, respondent said, "I had repossessed the truck with the idea of protecting my own investment."

After the equipment was unloaded, respondent parked it in a lot across the street from the company's San Francisco terminal. He inquired a day or so later about hauling a load

of freight to Portland and was informed by the company's San Francisco dispatcher that his equipment was not to be loaded out until Hendrickson had talked to respondent. Hendrickson was in San Francisco during the week following July 4th and respondent telephoned him at his hotel and made an appointment with him, but they missed connections.

A few days later, the company, by teletype to its San Francisco office, asked that the equipment be loaded with freight for Seattle and that respondent accompany it in order that his transaction with Larsen and Richeson might be "straightened out." Respondent and his driver drove the truck and trailer to Seattle, arriving there about July 13th. They parked the equipment in the company's yard, and respondent contacted Hendrickson, who said that he would have Larsen and Richeson come in the next morning "to get the thing straightened out." That night, according to respondent, Larsen and Richeson removed the equipment from the yard. Not knowing at that time who had taken it, he reported it to the Seattle police as having been stolen. Hendrickson approved respondent's so doing.

The parties do not agree as to whether the equipment was taken out of the yard before a certain conference was held between them or afterwards, but the exact time is not material. Larsen and Richeson testified that they drove the equipment out of the company's yard without the company's knowledge or permission and secreted it in Tacoma for several days. Either during the conference which was held in Hendrickson's office about July 18th (at which Hendrickson, Larsen, Richeson, Richeson's father, Danforth and respondent were present), or at some later time, Larsen and Richeson informed respondent that they had taken the equipment and did not intend to return it until their down payment was returned to them. During the conference in Hendrickson's office, Hendrickson suggested to respondent that he return the $1,600 to Larsen and Richeson. Respondent refused to do this, saying that Larsen and Richeson "had already cost me more than the money they had into it."

Respondent stayed in Seattle several days without obtaining possession of the equipment from Larsen and Richeson or any settlement of the controversy. He then returned to his home in California and advised the American Trust Company that the truck had been stolen.

On July 18th, the company ordered its insurance on the equipment canceled and so advised the American Trust Company. Hendrickson called respondent by telephone on July 29th in which conversation respondent advised Hendrickson that he had reported to the American Trust Company that the equipment had been stolen. Hendrickson volunteered no information as to the location of the equipment and respondent assumed that he did not know where it was.

In the meantime, the company had learned that Larsen and Richeson had the equipment in their possession and it requested them, through the truck broker who had attempted to arrange financing for them, to return the truck and trailer to the company's yard in Seattle.

Richeson testified that Hendrickson "told Mr. Winter [the broker] to tell us to get the truck back over and put it back on the run to make some money for everybody." Larsen and Richeson returned the equipment to the company's yard in Seattle.

By letter dated July 30th, the company advised respondent that the equipment had been in the company yard since July 27th. He immediately returned to Seattle and found it there. Certain of the wheels had been removed by the company and the equipment thereby immobilized. Hendrickson was away on vacation, and when respondent approached another company official he was told that the company had possession of the equipment and intended to keep possession until respondent satisfied the company's claims against it in the amount of approximately $2,000 and any claim that Larsen and Richeson had against it.

By letter dated August 4, 1949, the American Trust Company made demand upon respondent to pay the balance which had become due on his note in the principal amount

of $2,992.07 (plus interest and late charges) and threatened foreclosure proceedings against the equipment in the event that he failed to make such payment within ten days.

After Hendrickson returned from his vacation, respondent called at Hendrickson's office and asked him how much he would give him for the truck and trailer. Hendrickson offered, on behalf of the company, to pay $8,000 for them and respondent accepted the offer. At the request of respondent, who was without funds, Hendrickson advanced him fifty dollars. The trial court found that the sale occurred on August 15th, but the exact date does not appear from the record.

Respondent's only source of income during the period from May 1st to August 15th was from earnings of the equipment, and during that period he had received only the $1,600 paid by Larsen and Richeson and wages for one round trip to San Francisco. He testified that at this time Hendrickson was aware of "the situation with the American Trust Company."

Richeson testified that he and his father entered Hendrickson's office just as the sale was being completed, and that, while respondent was telephoning to the American Trust Company in San Francisco, Hendrickson turned to them and said "Whoever gives me 8,200 bucks, they can have it. I don't want it. I didn't want it in the first place, but I am going to get this thing straightened out one way or the other."

One week later, the company sold the equipment to Larsen and Richeson for $8,200, the additional $200 being intended to cover filing fees, title transfer costs and tax. Larsen and Richeson financed the purchase through a $9,500 loan at a Seattle bank which had previously declined to finance their purchase from respondent. C. D. Winter, the truck broker who had first directed Larsen and Richeson to respondent and who had previously aided them in their attempts to secure financing, personally guaranteed the loan. For his guaranteeing and negotiating the loan Mr. Winter was paid $1,500 by Larsen and Richeson.

During the trial, both respondent and appellants introduced expert testimony as to the market value of the truck and trailer during the period from May to August, 1949. These opinions as to value ranged from $8,000 to $15,500. The trial court, in awarding damages to respondent, fixed the value of the equipment at $11,875.

Concerning the value of the truck and trailer, and his reasons for making the $8,000 offer, Hendrickson testified as follows:

"I took a look at the rig and figured that it was worth $8,000 to us. That was what I could, I believe at that time, have purchased similar equipment for at several places on the Pacific Coast. . . .

"Mr. Harrington came to me and said that he absolutely just had to get off of that truck and get home to his family or else he would lose his family. He further stated to me that he had to get into some position or employment in the South, and he stated that he was going to work for the Morrison-Knutsen Company, and he just had to get shed of it as soon as possible; and I thought that I was doing the gentleman a favor by taking the equipment off his hands."

Hendrickson's testimony as to the company's interest in the matter which it was seeking to protect when it immobilized the equipment was:

"This was a large vehicle—60 feet long with our name imprinted all over it. There were our license plates on it and our insurance on it, and it was wandering all around the country. We did not know to what use or purpose it was being put to, but we wanted it returned to our yard until this matter was straightened out, and we further considered that we had a lien of some $2,400 against it. Q. When you got it back what did you do with it? A. It was placed in the yard, and at the direction of our shop superintendent certain of the wheels were removed from it and stored in our shop so that it was immobilized. Q. What was your reason for doing that? A. To get it set—firmly fixed in one spot until all the differences were reconciled."

Larsen, after first stating that respondent had refused to refund to them the $1,600 they had paid him, testified as to their motives in removing the equipment from the company yard in Seattle and secreting it in Tacoma as follows:

"Q. And what did you do thereafter? A. There was nothing much to do. We went back to Tacoma. I don't remember whether I had the truck in my possession at that time or not. I don't believe I did. It seems to me that after this discussion had taken place my partner and I decided that we were going to have that $1,600, so we thought that we would get possession of that truck, which we did. We needed that $1,600. We were a little frantic. We borrowed the money in the first place from Don Richeson's father—"

We have found it necessary to set forth at considerable length the material facts of the controversy from which respondent asked the trial court to find that a scheme of conspiracy had been entered into by appellants. From these facts the court found that Hendrickson and the company requested respondent to bring the equipment to Seattle after he had repossessed it at Portland; that this request was made under the pretense that Hendrickson and the company would attempt to mediate the difference then existing between respondent and Larsen and Richeson; that respondent returned the equipment to Seattle pursuant to such invitation; that he left it in the company's yard at the express invitation of Hendrickson and the company; that the company permitted Larsen and Richeson to remove it from the yard; that none of appellants were entitled to possession of the equipment; that the immobilizing of the equipment was wrongfully and unlawfully done by Hendrickson; that Hendrickson and the company knew that respondent was in financial difficulties as the result of the above described concerted acts; that Hendrickson and the company thus took advantage of respondent and forced him to sell his equipment to the company for $8,000; that the company sold the equipment to Larsen and Richeson one week later for $8,200; and that all these acts were done pursuant to a scheme of conspiracy of all appellants to obtain possession of the truck and trailer from respondent without paying the full value therefor.

In his brief, respondent points to three acts of appellants from which he argues that the existence of a conspiracy to injure respondent can be inferred. These are:

1. The invitation of the company to respondent to bring the truck and trailer to Seattle for the ostensible purpose of bringing about a settlement.

2. The act of Larsen and Richeson in removing the equipment from the Seattle yard and secreting it.

3. The act of the company and Hendrickson in removing certain wheels from the equipment upon its being returned to the company's yard by Larsen and Richeson and thereby depriving respondent of his right of possession.

Respondent argues that the combination and concert of these acts placed him in a financially disadvantageous position as a result of which appellants could and did force him to sell the equipment for a sum far less than its actual value. In his brief he has set forth the rules of law pertaining to civil conspiracy. He has carefully emphasized that the agreement between the conspirators need not be a formal one nor need its detail be completely worked out in advance. He also relies upon the rule that circumstantial evidence is competent to prove conspiracy and that a conspiracy, being by its nature secret, is usually suceptible of no other proof.

We have defined a conspiracy as a combination of two or more persons to commit a criminal or unlawful act, or to commit a lawful act by criminal or unlawful means. *Eyak River Packing Co. v. Huglen,* 143 Wash. 229, 255 Pac. 123, or as a combination of two or more persons by concerted action to accomplish an unlawful purpose, or some purpose not in itself unlawful by unlawful means. *Kietz v. Gold Point Mines,* 5 Wn. (2d) 224, 105 P. (2d) 71. It is essential that there be two or more conspirators; one cannot conspire with himself.

A conspiracy need not be proved by direct and positive evidence, and a finding that a conspiracy existed may be based on circumstantial evidence. *Kietz v. Gold Point Mines, supra; Sova v. First Nat. Bank of Ferndale,* 18 Wn. (2d) 88, 138 P. (2d) 181; *Lyle v. Haskins,* 24 Wn. (2d) 883, 168 P. (2d) 797.

Before a party can be held liable as a conspirator the evidence must show that such person entered into an agreement with the other conspirators to accomplish the object

of the conspiracy. *Dart v. McDonald,* 107 Wash. 537, 182 Pac. 628.

█ The gist of the present action is an alleged conspiracy between appellants to defraud and cheat respondent. We have held that the evidence required to establish such a conspiracy must be clear and convincing. *Federal Land Bank v. McMinimee,* 193 Wash. 321, 75 P. (2d) 138; *Bowyer v. Boss Tweed-Clipper Gold Mines,* 195 Wash. 25, 79 P. (2d) 713; *Quackenbush v. Slate,* 12 Wn. (2d) 201, 121 P. (2d) 331.

By reason of the events which occurred between May 1st and the middle of August, 1949, as disclosed by the evidence, Larsen and Richeson were able to purchase for $8,200 in August, 1949, respondent's truck and trailer for which they had agreed to pay the sum of $16,500 in June of that same year. Some of appellants' acts can be viewed with some suspicion. Mere suspicion, however, is not a sufficient ground upon which to base a finding of a conspiracy.

█ The court's finding that the company was acting in bad faith or with an ulterior motive at the time it requested respondent to return to Seattle with his truck for the purpose of having the transaction with Larsen and Richeson "straightened out" is clearly against the preponderance of the evidence, as is the finding that Larsen and Richeson removed the truck from the company's yard with its approval. This act of Larsen and Richeson would more logically appear to be contrary to the interest which the company claimed to have by reason of its name, licenses and insurance being on the equipment.

There is no evidence, therefore, up to this point, of any agreement between appellants to act in concert.

It might be inferred from the fact that the company induced Larsen and Richeson to return the truck to Seattle and then immobilized it that all appellants then agreed that such action should be taken in order that respondent might be coerced into making a settlement. But the company, when it immobilized the equipment, destroyed its earning power and it is an equally logical inference that the company's act in so doing was antagonistic to the interest claimed by Larsen and Richeson.

There is one fact not heretofore mentioned which, we believe, demonstrates conclusively that Larsen and Richeson viewed the company's position as antagonistic to their interest and that there was no conspiratorial agreement between them and the company.

Sometime prior to August 17, 1949, Larsen and Richeson evidently consulted a firm of attorneys relative to their transaction with respondent and the position of the company in the matter. On that date these attorneys wrote to respondent, at Seattle, as follows:

"Dear Mr. Harrington:

"Mr. R. V. Larsen and Mr. D. C. Richeson have consulted with us relative to the contract for the purchase of the Peterbuilt Truck and Trailer from you under date of June 18, 1949. They have informed us that the American Trust Company of San Francisco, California assert a lien against this truck and trailer in the sum of $2,900.00 and that the Los Angeles-Seattle Motor Express, Inc. assert a line in the sum of $2,048.00 against this equipment.

"At the present time, as you know, the truck and trailer have been dismantled and are in the possession of the Los Angeles-Seattle Motor Express, Inc. We would greatly appreciate an early opportunity to discuss this matter with you as *it is my considered opinion that the Los Angeles-Seattle Motor Express, Inc. are responsible to Larsen and Richeson for the loss of profits arising out of the unauthorized tie-up of this equipment.* It is also imperative that some arrangements be made with you to determine how the balance of the purchase price is to be paid. As you know, Mr. Larsen and Mr. Richeson have invested in this truck $6,100.00, $1,600.00 in cash and $4,500.00 made from operating the truck on four trips to Los Angeles, California.

"Your prompt attention to this matter will be greatly appreciated." (Italics ours.)

This letter was put in evidence by respondent over the strenuous objection of appellants.

The italicized sentence furnishes cogent evidence that there was no agreement between Larsen and Richeson on the one hand and Hendrickson and the company on the other that the company should dismantle and so keep possession of the truck and trailer. On the contrary, it

shows that Larsen and Richeson were inviting respondent to discuss with their counsel the assertion of a possible claim against the company because of its immobilization of the equipment.

From our examination of the evidence, we are of the opinion that the trial court erred in finding the existence of a conspiracy from the facts and circumstances of the case. The fact that Larsen and Richeson subsequently purchased the truck and trailer from the company for the sum of $8,200 is not material. Ordinarily, in the absence of fraud, courts are not concerned with the motives which impel a person to make a lawful purchase of property. *Johnson v. Northeast Transp. Co.*, 13 Wn. (2d) 254, 124 P. (2d) 794.

In our view of the case we need not decide whether Larsen and Richeson had any right to remove the equipment from the Seattle yard or whether the company had any lien or right of possession thereof. Where the facts and circumstances relied upon to establish a conspiracy are as consistent with a lawful or honest purpose as with an unlawful undertaking, they are insufficient. *Dunlap v. Seattle Nat. Bank,* 93 Wash. 568, 161 Pac. 364; *Dart v. McDonald, supra; Hair v. Old Nat. Ins. Agency,* 184 Wash. 477, 51 P. (2d) 398; *Federal Land Bank v. McMinimee, supra; Quackenbush v. Slate, supra.*

If we assume that the possession taken by each was wrongful, still it does not appear that such action was the result of any agreement, formal or otherwise, to act in concert. Each act of taking possession appears to have been performed independently of the other and in assertion of what the respective appellants conceived to be their legal rights. The acts of the respective appellants were entirely consistent with their desire to protect what they each conceived to be their individual interest in the premises and the evidence fails, therefore, to establish a conspiracy. *Quackenbush v. Slate, supra.*

It is not necessary for us to decide in this case whether the possession taken by Larsen and Richeson or that taken by the company was tortious. This action was

brought and tried upon the theory of a conspiracy. We have always followed the rule that a case will not be reviewed in this court on a theory different from that on which it was tried. *Graff v. Geisel,* 39 Wn. (2d) 131, 234 P. (2d) 884; *Capper v. Callahan,* 39 Wn. (2d) 882, 239 P. (2d) 541.

Since, for the reasons hereinbefore stated, the evidence preponderates against the trial court's finding that a conspiracy existed, the judgment is reversed with instructions to dismiss the action.

SCHWELLENBACH, C. J., MALLERY, GRADY, and WEAVER, JJ., concur.

