50 Wn.2d 762 (1957)
314 P.2d 625
LEWIS PACIFIC DAIRYMEN'S ASSOCIATION, Respondent,
v.
G.E. TURNER et al., Appellants.[1]
No. 33950.
The Supreme Court of Washington, Department Two.
August 22, 1957.
Foster & Foster and B. Franklin Heuston, for appellants.
Macbride, Matthews & Hanify, for respondent.
DONWORTH, J.
On September 13, 1955, plaintiff, a fluid milk products producer and distributor, brought this action against all except one of its employees and two former employees (and their respective spouses) who were working at its "Valley Dairy" plant in Olympia.
The complaint alleged that defendants were in possession of certain confidential information and route lists belonging to plaintiff. It further charged all defendants with conspiring to leave the employ of plaintiff at the close of business on September 15th, with the intention of commencing employment on the following day with a competing milk products distributing company (recently purchased by defendant G.E. Turner, who until then was employed by plaintiff as manager of its Olympia plant), using the trade information in their possession, acquired while in plaintiff's employ, to divert plaintiff's customers to the new employer.
Plaintiff sought to enjoin such activities on defendants' part and prayed for general equitable relief. A show cause *764 and temporary restraining order was issued ex parte upon plaintiff's application and filing of a one-thousand-dollar indemnity bond.
Defendants were G.E. Turner, hereinafter referred to as Turner (who was discharged by respondent on the day the complaint was filed), all office workers, all driver-salesmen, and all except one of the plant workers.
After the temporary restraining order was issued, an amended complaint was filed alleging that Turner had transferred his newly acquired dairy to his son, and asking the same relief against him. After a hearing was held on the show cause order, a temporary injunction was issued pendente lite. The case was tried on the merits in October, 1955, and a permanent injunction was entered March 2, 1956, the terms of which are hereinafter set out. From this decree, Turner, his son, and one former employee have appealed.
In order to properly understand the issues presented by this appeal, one must have clearly in mind the background and history of the relations between the parties.
Respondent has its principal place of business in Chehalis. There it prepares its various fluid milk products for distribution to ultimate consumers, to whom deliveries are made by driver-salesmen. The consumers referred to in this case were served by driver-salesmen operating from the Valley Dairy in Olympia.
In 1951, respondent acquired the Valley Dairy in Olympia. Appellant, G.E. Turner, was at that time employed by the former owner as manager of the plant. Upon acquisition of the plant by respondent, Turner was hired and continued in his former position. Prior thereto, Turner had contemplated the purchase of the dairy, but negotiations failed to result in agreement. At the commencement of this action, the Valley Dairy plant was used primarily as a distribution point for delivery of respondent's products to its retail and wholesale customers in the Olympia area.
Turner had been engaged in various phases of the milk production business for about thirty years. His experience *765 included dairy farming, work as a driver-salesman and solicitor, and plant manager.
Early in 1955, Turner, on several occasions, discussed with Olympia businessmen the possibility of his entering the fluid milk business.
Thereafter, respondent considered disposing of its Valley Dairy operation and, in July, 1955, entered into negotiations with Turner for the purpose of selling the Valley Dairy to him. Respondent desired the purchaser to continue to distribute its products. The parties failed to reach an agreement, and, on August 26th, Turner tendered his resignation, effective September 15th.
In July, 1955, the advertisement of the Valley Dairy in the classified section of the Olympia telephone directory to be issued in November was changed, upon Turner's direction, so as to omit the trade name (Darigold) under which respondent markets its products. Turner testified that the reason for the change was that he intended to purchase the Valley Dairy but did not intend to market under respondent's trade name.
On September 1, 1955, Turner, while still employed by respondent, acquired the Kaiser Dairy in Olympia, a small business having one delivery truck. He changed the name to Turner's Dairy. Prior to the commencement of the 1955 school year, on September 7th, an order for the purchase of milk to be delivered to two schools in the Olympia school district was placed by telephone to the Valley Dairy office. This order, representing a substantial volume of business over the course of the year, was diverted by Turner to his new competing business. Deliveries in compliance with the order were made by Turner's son, Gerald L. Turner (hereinafter referred to as Turner, Jr.), in the truck acquired with the Kaiser Dairy. A statement for the milk so supplied was rendered the school district by Turner's Dairy. Another customer who placed an order with the Valley Dairy was similarly diverted to Turner's Dairy.
There is evidence of several other solicitations of business by Turner while yet in respondent's employ, which were denied by him.
*766 Turner had led the majority of his codefendant driver-salesmen to believe that he owned a considerable pecuniary interest in respondent's Olympia operation when, in fact, he had none. One employee was advised by Turner that respondent's Chehalis management considered him too old for further employment. Turner likewise relayed to other driver-salesmen a statement attributed to respondent's management that the men were "crum-bums." He sought to create the impression among the driver-salesmen that he was responsible for their retaining their jobs.
During the month of August, one driver-salesman saw defendant Boysen, an office worker, in the process of preparing new route cards. Existence of such cards was verified by still another witness. The disposition of these route cards was not revealed during the trial. Defendant Boysen was not called as a witness.
Prior to acquiring the Kaiser Dairy, Turner placed an order with a local automobile agency for one, one-ton, insulated van-type truck, one pickup, and three, three-quarter-ton milk delivery trucks. He testified that the reason for purchasing five trucks was that he thereby obtained a fleet discount, resulting in a better price per unit. Thereafter, and several days prior to September 12th, he canceled his order for two of the milk delivery trucks. At the time of the trial, only the pickup truck had been delivered. Turner testified that the pickup was to be used as his business car; that the Kaiser truck was beyond repair and in need of replacement, and that the insulated van truck would be used in transporting milk products from his source in Hoquiam to refrigerated space in Olympia, for which he had made prior arrangements.
On September 12th, all of respondent's driver-salesmen were invited by Turner to dinner at a nearby roadhouse. He there advised the men that he was entering active competition with his former employer on September 16th, and offered employment to all. The evidence discloses that Turner advised the men that they were free to elect whether to go with him or to remain with respondent. All driver-salesmen *767 agreed to go with Turner. Turner, Jr., was present at the dinner. Solicitation of respondent's customers was discussed. The men were advised by Turner, Jr., that it was all right to solicit respondent's customers as long as there was blanket solicitation.
Three persons from the automobile agency with which Turner had placed his order arrived during the aforementioned dinner. They testified that their purpose was to induce Turner to revoke his cancellation of the two milk delivery trucks and reinstate his original order, and to procure Turner's signature on certain papers containing corrected terms.
The driver-salesmen called by respondent as witnesses testified that they intended, after changing employment, to continue delivering dairy products to their former customers. Only the trade name of the product and their employer would be changed. One witness testified that Turner advised him that printed cards were to be delivered to respondent's customers after working hours on September 15th, advising the customers that the respective driver-salesman had changed employment; that thereafter he (the driver-salesman) would be delivering a different brand of products; and that he hoped that the customer would continue patronizing him. There is no evidence of the existence of any such cards, nor is there evidence of an attempt to have them printed.
A few days prior to the dinner meeting of September 12th Mr. Anderson, respondent's appointee as Turner's replacement as manager of the Valley Dairy, arrived at the plant to acquaint himself with his new duties. He became aware of the situation and notified his superiors. This was the first knowledge respondent had as to the activities of Turner and the intentions of the driver-salesmen to quit on September 15th.
The record also reveals that prior to September 12th, Turner had solicited the employment of respondent's driver-salesmen on various occasions, and had advised one apparently disinterested witness that he believed all employees, except perhaps one, would be going with him.
*768 On September 5, 1955, Turner, Jr., returned to Olympia from employment in another state. He commenced working at the Turner dairy, accompanying a retained former Kaiser employee on the milk route. Turner, Jr., made the initial deliveries to the schools above mentioned.
On September 13th, having been served with process in this matter, and having been enjoined by the temporary restraining order above mentioned, Turner consulted counsel. Acting upon his counsel's advice, he transferred the business to Turner, Jr., who continued to operate the dairy and to make deliveries to several of respondent's former customers, as stated above.
That evening, all driver-salesmen, except one, met with union officials in the local union hall for the purpose of determining their respective obligations and rights under the contract by which they were employed by respondent. They were advised by local union officials to stay with the Valley Dairy or be subjected to possible discipline by the executive board of the local union. The driver-salesman not attending the union meeting was similarly advised at another time.
That union meeting is material here only in so far as it reflects that the advice given to the driver-salesmen by the union officials is one of two factors (the other being the service of the temporary restraining orders of court) which prevented the scheme of appellant Turner from becoming effective. If Turner's plan had not been previously discovered, respondent would not have had any employees on the morning of September 16th, and the operation of its business would have been suspended until new driver-salesmen could be obtained and sufficiently trained.
Thereafter, on September 15th, an order was issued by the court, based upon respondent's motion supported by affidavit, requiring Turner to appear before the court and show cause why he should not be held in contempt of court for violating the provisions of the prior temporary restraining order.
On September 18th, Turner, Jr., was made a party to this action by amended complaint. On the following day, the *769 court issued its show cause and temporary restraining order requiring Turner, Jr., to appear and show cause why he should not be held in contempt of court for violation of the provisions of the restraining order theretofore served upon his father.
The cause was thereafter tried on the merits from time to time during October, 1955, as the court calendar would permit.
Prior to and during the course of the trial, respondent settled its dispute with many of the original defendants. At the close of the case, there remained as parties defendant only appellants and three codefendant driver-salesmen and the nonappearing office employee, Boysen.
The trial court, on March 2, 1956, entered findings of fact which are substantially the same as the allegations of the amended complaint, and by its final decree enjoined all defendants:
"1. From using directly yourselves, or as an employee or agent of any person, firm or corporation other than Lewis Pacific Dairymens Association, the name `Valley Dairy' in connection with the distribution of milk or dairy products;
"2. From transferring any confidential business information belonging to the Lewis Pacific Dairymens Association, or records thereof, or divulging the contents thereof, to any person, firm or corporation whomsoever other than the Lewis Pacific Dairymens Association;
"3. For a period of three (3) years from and after September 13, 1955, from selling or distributing or soliciting the sale or distribution of any milk or other dairy products other than for and on behalf of the Lewis Pacific Dairymens Association to any person, firm, corporation or public body listed in Exhibit A attached hereto. (exclusive of those listed in Part III thereof)."
Appellants call attention to the fact that no contract of employment exists between respondent and any of its employees, with the exception of the contract between respondent and the local teamsters' union under which the driver-salesmen were employed. That contract neither requires notice of termination of employment nor does it contain a restrictive covenant against solicitation of the *770 employer's customers by a former employee subsequent to termination of his employment. Since no driver-salesman has appealed, the union contract will not be further considered.
Appellants are, first, Turner, Sr., respondent's former Valley Dairy manager, and his wife; second, their son, Gerald L. Turner, who was never employed by respondent; and third, Irma M. Haddon, one of respondent's former office employees at the Valley Dairy, and her husband.
[1] Respondent contends that appellants Turner should not be heard by this court on appeal unless and until they have purged themselves of contempt of the trial court. Respondent recognizes that the trial court made no finding or determination with respect to this issue, but urges that, since this is an equity case, it is before this court de novo. This contention is without merit. See Johnson v. Harvey, 44 Wn. (2d) 455, 457, 268 P. (2d) 662 (1954), and cases cited therein. See, also, Rule on Appeal 43, 34A Wn. (2d) 47, as amended, effective January 2, 1953. Since the trial court has not passed upon the alleged contemptuous conduct of the Turners, we will not do so here for the first time.
[2] Appellants urge that the bond required to be posted by respondent is inadequate. This point is raised for the first time on this appeal and, therefore, will not be considered. Johnson v. Seattle, ante p. 543, 313 P. (2d) 676 (1957).
[3] It is next contended that the court erred in entering its order of October 6, 1955, granting the injunction pendente lite. Rule on Appeal 14, 34A Wn. (2d) 20, and specifically subdivision (3) thereof, permits an appeal from such order. No appeal having been timely prosecuted from this order, we have no jurisdiction to review that order. Appellants' second assignment of error, therefore, cannot be considered.
[4] Assignments of error 3, 4, 5, 6, 8, 9, and 12 are directed to certain findings of fact. After our examination of the record, we cannot say that the evidence preponderates against them. Hence, they will not be disturbed. Silhavy v. Doane, ante p. 110, 309 P. (2d) 1047 (1957). For the same reason, findings of fact numbered 11 and 12 must be sustained, except as hereinafter discussed.
*771 We have considered with care the many proposed findings of fact offered by appellants for entry by the trial court which were rejected. Many of them merely contain recitals of the evidence, are cumulative and unessential to the determination of the cause. Others are in the nature of conclusions drawn from the evidence, while still others are based upon appellants' version of the facts, as to which there was conflicting evidence. As to the latter, the trial court believed respondent's witnesses and entered contrary findings of fact. We find no error in respect to these matters.
Error is assigned to finding of fact No. 8, which reads as follows:
"That the defendant G.E. Turner has instigated and concocted, in connection with the other defendants herein named, a conspiracy for the purpose of depriving plaintiff of its customers and good will and transferring said customers' business and patronage from the plaintiff to defendant G.E. Turner, who now does business under the trade name and style of Turner's Dairy, and through him to some other supplier of milk. That said conspiracy consisted of a plan for said defendants (i) to quit the employment of the plaintiff in a body on or about September 15, 1955, and to disable the operations of plaintiff's milk distribution business in Olympia, to-wit: The Valley Dairy; (ii) to take with them route information, customer information and other trade information and knowledge with respect to plaintiff's customers which they have in their knowledge, possession or control by reason of their aforesaid fiduciary relationship to plaintiff; (iii) to immediately commence the distribution of milk and other dairy products in other milk distribution trucks belonging to G.E. Turner, d/b/a Turner's Dairy, and to distribute the milk supplied by said Turner's Dairy and by him obtained from sources other than the plaintiff, and in such manner to distribute such milk and dairy products to persons who had theretofore been and who now are the customers of the plaintiff and to capture the customers of Valley Dairy for G.E. Turner, d/b/a Turner's Dairy; (iv) to thereby deprive the plaintiff of the good will of its business and the custom of the said customers, and (v) to transfer the same to the said Turner's Dairy by the said wrongful use of the fiduciary information and customer relationship which defendants have and possess by virtue of their employment by the plaintiff."
*772 [5] A conspiracy is a combination of two or more persons to commit a criminal or unlawful act, or to commit a lawful act by criminal or unlawful means; or a combination of two or more persons by concerted action to accomplish an unlawful purpose, or some purpose not in itself unlawful by unlawful means. It is essential that there be two or more conspirators; one cannot conspire with himself. Harrington v. Richeson, 40 Wn. (2d) 557, 570, 245 P. (2d) 191 (1952). In order to establish an actionable conspiracy, there must be "`a breathing together, or combination acting in unison toward a common objective.'" Baun v. Lumber & Sawmill Workers Union, 46 Wn. (2d) 645, 661, 284 P. (2d) 275 (1955).
"To constitute a conspiracy the purpose to be effected by it must be unlawful in its nature or in the means to be employed for its accomplishment, and, where the object in view is lawful and no unlawful means are used, there can be no civil action for conspiracy, even though damage results and even though defendants acted with malicious motives." 15 C.J.S., Conspiracy, 998, § 3. Kietz v. Gold Point Mines, Inc., 5 Wn. (2d) 224, 231, 105 P. (2d) 71 (1940).
[6] Before a party can be held liable as a conspirator, the evidence must show that such person entered into an agreement with the other conspirators to accomplish the object of the conspiracy. Dart v. McDonald, 107 Wash. 537, 182 Pac. 628; Harrington v. Richeson, supra.
[7] A plaintiff in an action for conspiracy to defraud must meet the burden of proving his case by clear, cogent, and convincing evidence. Unquestionably, the words "clear, cogent, and convincing" mean something more than a mere preponderance of the evidence. Cheesman v. Sathre, 45 Wn. (2d) 193, 197, 273 P. (2d) 500 (1954). Mere suspicion is not a sufficient ground upon which to base a finding of conspiracy. Harrington v. Richeson, supra.
[8] Where the facts and circumstances relied upon to establish a conspiracy are as consistent with a lawful or honest purpose as with an unlawful undertaking, they are insufficient. Baun v. Lumber & Sawmill Workers Union, supra; Harrington v. Richeson, supra.
*773 [9] Appellant Haddon was an office employee of respondent and, as such, had access to the business records of respondent's Valley Dairy operation. She had little, if any, personal contact with respondent's customers. She did not attend the meeting of September 12th above described. The record fails to reveal, even inferentially, that she had any agreement whatever with her co-workers, except appellant Turner, from whom she agreed to accept employment on September 16th. Mrs. Haddon was not under contract with respondent. There is no evidence showing that she was not free to terminate her employment with respondent without notice. Likewise, there is no evidence that she took, or intended to take, or use, any of respondent's confidential information upon terminating her employment with respondent.
We conclude that the facts and circumstances relied upon to establish Mrs. Haddon's participation in the alleged conspiracy are as consistent with a lawful purpose as with an unlawful undertaking. They are, therefore, insufficient to establish her as a participant in the alleged conspiracy. Baun v. Lumber & Sawmill Workers Union, supra.
The question of the applicability of the quoted finding of fact (No. 8) to the defendants who have not appealed from the final decree, is not before us. As to them, we express no opinion.
[10] However, as to the appellants Turner, the evidence clearly shows that, while still in the employ of respondent, Turner (a) acquired a competing business operation; (b) took unfair advantage of his position in the management of the Valley Dairy to instill within his fellow co-employees, serving under him, a false impression that he was directly responsible for their continued employment (based largely upon his false assertion of substantial ownership in his employer's operation); (c) diverted to his competing business the orders placed by two of his employer's customers; (d) conveyed the information relative to the school district account to his son, who thereafter used the information in making the initial and subsequent deliveries pursuant thereto; (e) solicited the business of two other persons, then *774 customers of his employer; (f) arranged for a daily supply of milk to be shipped from Hoquiam to his refrigerated storage space in Olympia; (g) arranged for refrigerated storage space therefor at the Port of Olympia; (h) opened a business office in Olympia; (i) gave a dinner party for the sole purpose of inducing the driver-salesmen to quit the employ of respondent on September 15th and to commence working for him on the following morning; (All driver-salesmen agreed at that time to "go with Turner." At this dinner, Turner, Jr., discussed the matter of solicitation of respondent's customers, and stated that it was proper if it were a general solicitation.) (j) induced all other co-employees to leave respondent's employ for employment with him; (k) intended thereby to suspend respondent's Valley Dairy business on the morning of September 16th for an indefinite period of time, resulting in an immeasurable loss of customers and goodwill; and (l) the plan would have succeeded had it not been for the intervention of the two extrinsic events hereinabove mentioned. After being discharged by respondent on September 13th, and restrained by the court as hereinbefore stated, Turner transferred his dairy to his son, who thereafter continued to deliver milk to respondent's former customers theretofore diverted by Turner.
We conclude that the conspiratorial conduct of appellants Turner is established by evidence which is clear, cogent, and convincing. That evidence does not preponderate against finding of fact No. 8, above quoted, which, therefore, will not be disturbed. Silhavy v. Doane, supra.
Assignments of error No. 10 and No. 11 relate to findings of fact No. 11 and No. 12, respectively, which we quote, in part, as follows:
"... that a permanent injunction should be issued by this court restraining and enjoining the defendants from proceeding further in the carrying out of the said conspiracy or any part thereof to deprive the plaintiff of its customers and from soliciting or selling milk to the plaintiff's customers." (Italics ours.)
*775 and
"That a reasonable limitation on the persons whom the defendants, and each of them, should be enjoined from selling, distributing or soliciting the sale of milk or dairy products, is that such injunction should be limited to those persons, firms, corporations and public bodies who were, according to the books and records of the plaintiff, its customers (as hereinbelow described) at the time the aforementioned conspiracy was concerted and begun ..." (Italics ours.)
The portions of the findings of fact quoted above are essentially the trial court's conclusions concerning the preventive remedy it considered necessary to protect respondent from future unfair competition. Referring solely to appellants Turner, we hold that the conclusions of the trial court, so expressed, are not justified by the facts existing at the close of the evidence. The terms of the final decree of injunction, above quoted, are based upon conclusions of law, substantially in accordance with findings of fact No. 11 and No. 12.
The factual situation which existed on September 13, 1955, at the inception of this action, clearly established the necessity for preventive injunctive relief, since Turner was then an employee of respondent and Turner, Jr., was delivering milk to certain former customers of respondent previously diverted by his father.
But, on October 11, 1955, the day on which the taking of testimony was concluded in the trial court, an entirely different state of affairs existed. Turner was no longer employed by respondent. He was not bound by any contract not to compete with his former employer after the termination of his employment. Turner, Jr., had never been employed by respondent. Neither of respondent's former customers theretofore diverted to the Turner Dairy was then being served by it. All of respondent's driver-salesmen, except defendant Stewart, were still in its employ. Some of them had signed agreements with respondent to cease and desist from doing the acts complained of in the *776 complaint. The others were restrained from performing such acts by order of the court.
Many of the so-called "trade route" cases decided by this court and by the California courts are cited in support of the respective positions of the parties hereto. Since neither of appellants Turner occupied the position of a trade route salesman for respondent, we fail to recognize the applicability of those decisions to the factual situation presented to the trial court at the close of the record. We, therefore, do not find it necessary to discuss them. However, certain related cases were considered by this court recently in the case of National School Studios, Inc. v. Superior School Photo Service, Inc., 40 Wn. (2d) 263, 242 P. (2d) 756 (1952), wherein we said:
"In the absence of an express contract not to compete after termination of his employment, an employee is generally free to solicit business from customers of his former employer, although he gained knowledge of such customers while in the employer's service.
"Restatement, Agency, 896, § 396, states this principle as follows:
"`Using Confidential Information after Termination of Agency.
"`Unless otherwise agreed, after the termination of the agency, the agent:
"`(a) has no duty not to compete with the principal; and
"`(b) is subject to a duty to the principal not to use or disclose to third persons, on his own account or on account of others, in competition with the principal or to his injury, trade secrets, written lists of names, or other similar confidential matters given to him only for the principal's use or acquired by the agent in violation of duty. The agent may use general information concerning the method of business of the principal and the names of the customers retained in his memory, if not acquired in violation of his duty as agent.'"
(See 35 Am. Jur. 529, § 100; and 56 C.J.S. 483, § 72.)
[11] The purpose of an injunction is not to punish the wrongdoer for past transactions, but to restrain present or threatened future wrongful acts. State ex rel. Department *777 of Public Works v. Skagit River Navigation & Trading Co., 181 Wash. 642, 645, 45 P. (2d) 27 (1935).
[12] While we agree that the factual situation presented fully justified equitable relief, we cannot agree that the third paragraph of the decree of injunction, which restrained appellants Turner for a period of three years from September 13, 1955, from selling or distributing or soliciting the business of respondent's existing customers (consisting of approximately thirteen hundred persons, firms, and corporations listed in the decree), was necessary to protect respondent against existing or threatened acts of appellants Turner. That provision of the decree is too broad in that it contravenes the principles recognized by this court in the National School Studios case, supra, and imposes an unwarranted restraint upon an unfaithful former employee for his past misconduct.
As to appellants Haddon, the decree is reversed, with instructions to enter a judgment of dismissal, they to recover their costs herein.
As to appellants Turner, the decree is modified by eliminating the provisions of paragraph three thereof. In all other respects, the decree is affirmed. Since respondent and appellants Turner have each prevailed substantially on this appeal, each shall bear his own costs herein.
HILL, C.J., SCHWELLENBACH, FINLEY, and ROSELLINI, JJ., concur.
NOTES
[1] Reported in 314 P. (2d) 625.