[No. 30104.   Department Two.   June 7, 1947.]

MAY J. ELLIS, *Respondent*, v. RUTH E. WADLEIGH, *Individually and as Executrix, Appellant.*[1]

[1]Reported in 182 P. (2d) 49.

*Arthur A. Giblin,* for appellant.

*Copeland & Tollefson,* for respondent.

HILL, J.—Gardner Fletcher died December 6, 1923, leaving an estate appraised at $21,852.62 to his wife, Verbena Fletcher.  Mrs. Fletcher, then about sixty-six or sixty-seven

years of age, continued to live in the family home at Puyallup.

At her invitation and insistence, her sister, May Ellis, some two years her junior, came from Milwaukee, Wisconsin, in the early part of 1924, to live with her. The two sisters lived together for slightly more than sixteen years, with Miss Ellis picking berries and fruit, taking care of ducks and chickens, doing housework, and performing personal services for Mrs. Fletcher, such as rubbing ointment on her swollen limbs, brushing and fixing her hair, etc. Mrs. Fletcher was a recluse and, except on rare occasions, did not permit visitors in her home. Miss Ellis made most of the outside contacts that were required.

By 1940, this work was becoming too onerous for Miss Ellis, who was then approaching eighty years of age. At her request, a niece, Judith Wadleigh, came out from Chicago in July of that year and, on seeing her physical condition, insisted that Miss Ellis leave the Fletcher home and go with her. This she did, and they remained in Tacoma until the last day of September, 1940, when they left for Chicago. There they remained until they went to Rochester, New York, sometime after August, 1941.

In the early part of 1941, Mrs. Fletcher's condition became such that she could not take care of herself, and she was hospitalized. She could not secure her release from the hospital until there was someone available to take care of her. She therefore paid the expenses of another niece, Ruth Wadleigh, a sister of Judith, to come from Chicago to Puyallup for that purpose. They did not move back into the old home, but took an apartment.

In March, 1942, Mrs. Fletcher made a will, leaving all of her estate to Ruth Wadleigh except a trust fund of three thousand dollars for Miss Ellis, payable at the rate of thirty dollars a month, and three small bequests. A contract bearing the same date as the will was executed. It recited the sacrifices which Ruth was making to stay with Mrs. Fletcher and the onerous duties she had to perform in taking care of her, and provided that, in consideration of her taking care of Mrs. Fletcher, she was to receive all of

Mrs. Fletcher's estate except the trust fund and the three small bequests referred to.

Miss Ellis and Judith Wadleigh returned to Puyallup from Rochester, New York, in June, 1942, and, after a short stay, were told by Mrs. Fletcher to return home.

Ruth Wadleigh continued to care for Mrs. Fletcher until her death on December 22, 1943, and on January 6, 1944, the will making Ruth the principal beneficiary was admitted to probate. The appraised value of the estate was $32,745, and it appears that several items, at least, were worth considerably more than their appraised value.

This action was commenced by Miss Ellis on December 11, 1944, against Ethel Rowe, Pearl Bliss, Goldie Bliss, and Ruth E. Wadleigh as the beneficiaries under that will, and against Ruth E. Wadleigh as executrix of the estate of Verbena G. Fletcher, deceased, on the theory that there had been a contract between Mrs. Fletcher and Miss Ellis to the effect, as stated in the complaint,

". . . that said Verbena G. Fletcher promised plaintiff [respondent] orally and in writing that she would leave all of her property to plaintiff if plaintiff would take care of her as long as she lived, or as long as plaintiff was able. . . ."

It should be noted here that there was no evidence supporting the phrase, "or as long as plaintiff was able."

The first three defendants named received small bequests under the will, and the action was not prosecuted against them.

The trial court found that there had been an agreement by Mrs. Fletcher to leave all her property to Miss Ellis if she would come to Puyallup and live with, care for, and assist Mrs. Fletcher, and entered a decree directing that all the remainder of the estate of Verbena Fletcher, deceased, be distributed to May J. Ellis, and giving her a judgment against Ruth Wadleigh, individually, under certain circumstances not material to our present inquiry. Ruth Wadleigh appeals, individually and as executrix of the estate of Verbena G. Fletcher, deceased.

There is no serious dispute as to any of the foregoing, although, of course, the allegations of the complaint are denied and the validity of the findings and judgment are strenuously contested.

The appellant contends that: (1) The evidence does not establish that there was any contract between Mrs. Fletcher and Miss Ellis, or its terms; (2) the evidence does not establish that the services were performed by Miss Ellis in reliance on the contract; (3) if there was a contract, it was abandoned; and (4) Miss Ellis was estopped to maintain the action.

We are impressed with the fact that the real respondent here is not May J. Ellis, but Judith Wadleigh, in whose favor Miss Ellis has made a will. Judith has been the moving spirit in this litigation. We do not want the statement concerning her interest in the controversy to indicate that we disbelieve her testimony, but, rather, to indicate our reluctance to uphold an oral contract to make a will, or to leave property, on the testimony of those who will, immediately or ultimately, benefit thereby. The record shows nothing derogatory to Judith, but, because of her obvious interest, we have searched the record with the thought in mind of determining whether the respondent could establish a case without recourse to her own testimony or that of Judith Wadleigh. We believe that, on the essential details, she could and did.

A Chicago lawyer, Cornelia Wyse, testified unequivocally that Ruth Wadleigh knew of an agreement between Miss Ellis and Mrs. Fletcher whereby the latter was to leave all her property to the former, and that, when Ruth left Chicago to come to Puyallup, she left with the avowed purpose of seeing that Mrs. Fletcher did leave her property to Miss Ellis, who had earned it through long years of faithful service. In less than a year, Ruth herself had an ironclad contract with Mrs. Fletcher and a will in her own favor. Not content with this, she tried to induce Elmer Healey, Mrs. Fletcher's attorney and a member of this bar, who had prepared the contract and the will, to persuade Mrs. Fletcher to turn all the property over to

her, to avoid, she said, the expense of probate. She made it clear to Mr. Healey that, if he could do this, it would be much more profitable than probating Mrs. Fletcher's estate.

Ray Gregory, Mrs. Fletcher's banker and financial adviser, testified that there was some seven or eight thousand dollars in Mrs. Fletcher's bank account when Ruth Wadleigh came to live with her; that two and a half years later, at the time of Mrs. Fletcher's death, there was less than five hundred dollars; and that some five thousand dollars of that amount had gone to Ruth Wadleigh. In addition, Ruth had secured three thousand dollars in coupons, which she claims was a gift, and a thousand-dollar bond.

This picture of Ruth Wadleigh, and it is not a pretty one, comes from the lips of Wyse, Healey, and Gregory, disinterested witnesses.

No one other than the Wadleighs and Elmer Healey ever heard Mrs. Fletcher say that there was or was not an agreement, between herself and Miss Ellis, whereby May Ellis was to have her property in return for taking care of her. However, Mr. Healey's testimony meets all the tests that have been applied in cases of this kind. These cases are not to be determined on the basis of the number of witnesses. If Elmer Healey told the truth, and we believe that he did, the fact of the existence of an agreement and its essential terms is established. He testified first as to a conversation with Ruth Wadleigh, as follows:

"Miss [Ruth] Wadleigh came to me, to my office here in the court house, and told me that Mrs. Fletcher wanted to see me relative to the drawing up of a will. At that time she called my attention to the fact that I had known Mrs. Fletcher for a long time and that Mrs. Fletcher had unusual confidence in my judgment; that she would not have anybody else draw the will. So when we went into details—I had remembered Mrs. Fletcher for many years back and also knew Mr. Fletcher very well and had done some business for him, and I recalled that Mrs. Fletcher's sister had lived with Mrs. Fletcher for a long time, and it was generally rumored—I had no knowledge—but it was generally rumored that the sister would be Mrs. Fletcher's beneficiary. That matter I discussed with Miss Wadleigh, called her attention

to that, and she knew of that arrangement but said that the arrangement between her sister and Mrs. Fletcher had become unbearable to Mrs. Fletcher and that Mrs. Fletcher could no longer carry on that arrangement and that it was because of this conflict that had developed between Mrs. Fletcher and her sister that she wanted the change made; that her sister had gone home and Mrs. Fletcher had sent East and wanted Miss Wadleigh to come out and fulfill the same functions that the sister would have fulfilled, and she told me that she was going to do it and that Mrs. Fletcher wanted to make out a will, wanted to protect her along the lines I have suggested."

He further testified that, the same night, he stopped and talked to Mrs. Fletcher. Concerning this conversation, he said:

"Well, after talking to Mrs. Fletcher and noting her physical condition—I was somewhat in doubt as to whether or not I ought to draw a will, so at Miss Wadleigh's instigation Mrs. Fletcher went over the entire transaction relative to the way she was brought out here and the former transactions of her sister, so that I would have the entire details before me, and it was after I had the entire details related rather vividly by Mrs. Fletcher that I was satisfied as to her mental ability to make a will."

He further testified as follows:

"Q. What if anything did Mrs. Fletcher say to you in the presence of Miss Wadleigh about the circumstances of Miss Ellis coming out here? A. Oh, I can only tell you the sentiment of it, the thought of it. Q. What was the thought? A. Well, that Miss Ellis had come out here and spent many years out here as an aide and helper with the understanding that she was to be paid, that the remuneration she was to get would be the residue of the estate at the time of Mrs. Fletcher's demise."

And, further concerning statements by Mrs. Fletcher, he testified:

"She [Mrs. Fletcher] said she was now prepared to take care of Miss Wadleigh the same as she had Miss Ellis and give Ruth, as she put it, the estate, except that she wanted to reserve a certain bequest to Miss Ellis that she wanted her to have. That seemed to be satisfactory to everybody concerned."

The contract between Ruth Wadleigh and Mrs. Fletcher (plaintiff's exhibit No. 7) has already been referred to. Mr. Healey, questioned concerning Mrs. Fletcher's comparisons of that agreement with the one that she had had with Miss Ellis, testified as follows:

"Q. Did Mrs. Fletcher make any comments about that agreement? A. Well, just general comments; that that was about the same arrangement that she had with her sister. Q. She said that was the same agreement she had with Miss Ellis? A. She did not say it was the same; she said it was similar. Q. Like it. A. Yes."

He testified that comments of similar character were made several times, and that "it might have been one or two and it might have been six" times. The court interrupted with the following question:

"You mean by that that Mrs. Fletcher on several occasions said that this agreement that was drawn for Ruth was similar or like the one that she had with May; that she made that statement several times?"

to which Mr. Healey answered:

"Some several times, Your Honor. I recall a discussion as to the fact that Ruth was now taking over where Miss Ellis would have taken over if she had carried out her terms of the agreement."

While appellant must concede that this testimony is definite as to the fact that there was an agreement between Mrs. Fletcher and Miss Ellis, appellant insists that the terms are not sufficiently definite. She inquires as to what is meant by the "residue of the estate," which Mr. Healey testified Miss Ellis was to receive. The will Mrs. Fletcher executed to carry out the agreement would afford the best answer to that question.

█ Proof that a will actually had been executed has been a most important factor in cases of this character. In *Worden v. Worden,* 96 Wash. 592, 165 Pac. 501, the court said:

"The will itself is strong confirmatory proof that such an agreement was entered into. A case of this kind would not require the same degree of convincing evidence as those

cases where no will had been made in conformity with an alleged oral contract."

See, also, *Olsen v. Hoag,* 128 Wash. 8, 221 Pac. 984.

Here there is evidence that a will was executed shortly after Miss Ellis came to live with Mrs. Fletcher. It remained in effect until after Miss Ellis left the Fletcher home in 1940, and then Mrs. Fletcher cut the name of Miss Ellis out of the will. A witness who held this will in his hand as he testified, said that it left the greater part of the estate to Miss Ellis. This will is not in evidence. Appellant waxes both sarcastic and righteously indignant over the failure of the respondent to put this will in evidence. She says, at p. 66 of her opening brief:

"However, there was a purported will produced at the trial supposed to be Mrs. Fletcher's first will in which a 'greater part' of her estate was to go to May Ellis. See statement of Facts, Page 62, lines 2 to 16. That is the only knowledge that we are supplied with relative to *any* will in which May Ellis was to get the 'greater part.' Is the greater part 51%, or is it something other than that? The purported will above referred to was not *marked* for *identification* nor *offered* by *respondent* in evidence and it is *not* in evidence. Why, I do not know. We do not have it to examine as to its date, terms, or at all. Do we know that it was in accordance with the so-called 'oral agreement,' or referred to it in any manner? What was its date? We can only speculate. Did its terms militate against what the respondent (plaintiff) claims were the 'terms' of the alleged 'oral' agreement?" (Emphasis supplied by appellant.)

The record, however, shows that the will was, and we presume is, in appellant's possession. She did not offer it in evidence, and, to paraphrase the statement in her brief, "Why, we do not know."

Absolute certainty as to terms is not exacted; reasonable certainty is sufficient. In *Luther v. National Bank of Commerce,* 2 Wn. (2d) 470, 98 P. (2d) 667, after laying down the familiar rule that oral contracts to devise and bequeath real and personal property are enforcible, if they are established by evidence that is conclusive, definite, and beyond legitimate controversy, and if there has been suffi-

cient performance to remove the bar of the statute of frauds, this court says:

"It is undoubtedly true that, in order to warrant a decree of specific performance, the terms of the contract must be so clear, definite, certain, precise, and free from obscurity or self-contradiction, that neither party can reasonably misunderstand them, and that the court can discern the intention of the parties and interpret the contract without supplanting any of its provisions or supplying anything additional. However, absolute certainty is not exacted; reasonable certainty is all that is required. 58 C. J. 930, § 96. If, from all the evidence in the case, the court can ascertain and determine the contract with reasonable certainty, that is sufficient. *Faucett v. Northern Clay Co.*, 84 Wash. 382, 146 Pac. 857; *Le Marinel v. Bach,* 114 Wash. 651, 196 Pac. 22; *Herren v. Herren,* 118 Wash. 56, 203 Pac. 34."

If the contract with Ruth Wadleigh, which is in evidence, is similar to the one with Miss Ellis (and Mrs. Fletcher said it was), the "residue of the estate" means all of the estate after certain small bequests are paid. That is exactly what Miss Ellis asks for here. It is certain from Mr. Healey's testimony that Ruth Wadleigh occupies practically the same position in the written contract that Miss Ellis occupied in the oral contract. Supplemented with the written contract, which is in evidence, no one should have any trouble in determining what is meant by "residue of the estate."

If more specific terms of the agreement are desired, they are available from the testimony of Judith Wadleigh, who testified, without objection, to a conversation with Mrs. Fletcher in 1940, after she had taken Miss Ellis from the Fletcher home and while she and Miss Ellis were staying in Tacoma and visiting with Mrs. Fletcher on occasion. Her testimony is that Mrs. Fletcher said to her:

" 'I have an agreement with May and Aunt May came here to stay with me and help me and I promised her that she could stay with me always and I would leave her everything I have, everything I possess, all of my money and property and everything, so she must stay here with me; she must not go anywhere.' "

This is as definite as could be expected as to what Miss Ellis was to do and as to what Mrs. Fletcher was to do. Mrs.

Fletcher not only was stating that there was an agreement, but she was insisting that it be carried out. This was evidence on which we have a right to rely, but we have been at some pains to make clear that we believe that the contract and its terms were established without it.

■ With the appellant's first contention, that the evidence does not establish that there was any contract between Mrs. Fletcher and Miss Ellis or its terms, we cannot agree. The contract and its terms are established by evidence which meets the test of being conclusive, definite, certain, and beyond all legitimate controversy.

■ That there was performance of the contract by Miss Ellis by some sixteen years of devoted service is likewise established by Minnie Peak and Ray C. Gregory, disinterested witnesses. It is likewise admitted by appellant, who testified:

"She [Miss Ellis] had a very very hard time for many years, was sick and worked fifteen hours a day, and there is not a relative that does not want her taken care of."

We have intentionally refrained thus far from basing any findings in this case on the testimony of May Ellis, because, while the trial court was impressed with her candor, honest demeanor, and sincerity, the record also shows that she was eighty-seven years old at the time of trial, somewhat loquacious, and easily led into statements such as those upon which the appellant relies to establish that Miss Ellis came to be with her sister at Puyallup because the sister needed her, and not for any pecuniary consideration.

Since, for support of this contention, appellant is relying on the cross-examination of Miss Ellis, to answer that contention we feel justified in going to another part of her examination, in which she testified, without objection, concerning a letter from Mrs. Fletcher:

"She said if I came out to stay with her and helped her take care of herself and was nice to her, that if she passed away before I did she would leave me all of her property," and in going, also, to another part of her cross-examination, during which the following occurred:

"Q. Do you remember when it was she first told you about leaving everything to you if you lived longer than she did? A. She wrote that to me. That was before I went out. *That is the way I came to go out there.* . . .

"Q. You said Aunt Verbena wrote a letter in which she said that if you would survive her, live longer than she did, that you would get her money? A. Yes. Q. Did you ever tell her, promise her that you would stay with her all your life? A. Yes, I did, and I intended to do so." (Italics ours.)

Judith Wadleigh likewise testified, without proper objection, concerning statements contained in a letter, now lost, written by Mrs. Fletcher to Miss Ellis in 1924, in which Mrs. Fletcher promised to make a will in favor of Miss Ellis if she would come and stay with her.

█ Appellant now complains about testimony by Miss Ellis and Judith Wadleigh concerning statements by the deceased, Mrs. Fletcher, and to the contents of letters written by her and now lost. Appellant relies on Rem. Rev. Stat., § 1211 [P.P.C. § 38-3]. Both by failure to make proper objection and by the cross-examination of Miss Ellis, appellant has waived any error. That the bar of the statute may be waived, has several times been decided by this court. See *Miller v. O'Brien,* 17 Wn. (2d) 753, 137 P. (2d) 525, and the cases cited on p. 766 thereof. We have heretofore pointed out that the contract between Miss Ellis and Mrs. Fletcher was sufficiently established without the testimony complained of.

█ When Miss Ellis went to Puyallup, that constituted an acceptance of Mrs. Fletcher's offer, and the fact that she might have gone in any event is of no consequence. The services rendered did not, in themselves, prove a contract, but, the contract being proved, the services were such that it would be assumed that they were rendered in reliance on it. They cannot otherwise reasonably be accounted for.

In *Luther v. National Bank of Commerce, supra,* the promisee, after beginning her services for the promisor, married him, and it was contended that her services after marriage were not in consideration of the promise to convey the property to her, but were duties as the wife of the promisor. The court's answer was:

"We think that another rule applicable to the facts of this case is that found in Restatement of the law of Contracts, 110, § 90, as follows:

" 'A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'

"It seems to us that it would be a gross injustice to deny respondent the benefit of her bargain, which she performed to the letter, merely because by operation of law the services which she rendered subsequent to marriage are held to be without consideration."

Appellant next contends that, if there was a contract, it was abandoned when Miss Ellis left the Fletcher home in July of 1940, and again in June of 1942.

It was established that Miss Ellis was not well and needed care and attention which she could not or did not receive in the Fletcher home, when Judith Wadleigh took charge of her in July, 1940. Immediately following Miss Ellis's removal from her home, Mrs. Fletcher unquestionably was very angry, and immediately proceeded to cut Miss Ellis's name out of her will and to make a new will, dated July 30, 1940, substituting another sister, Tina Radtke, as the principal beneficiary. However, it was only a short time before she realized that Miss Ellis was really ill and required care and attention. Her letters to Miss Ellis, written during part of August and in the month of September, 1940, while Miss Ellis was still in Tacoma, and during the winter of 1940 and the spring of 1941, while she was in Chicago, show a deep concern for her welfare and a desire to have her back as soon as she could come. They contain assurances that everything would be the same between them as it was before. On August 20, 1940, Mrs. Fletcher wrote to Miss Ellis:

"Get well first, that's the first consideration. I will help all I can—by being reasonable—and not asking too much of you until you are well again."

On September 12, 1940, she wrote again:

"All you have to do is sleep a lot, eat a lot, and get all well again— Now, don't you worry about a single thing  .  .  .

you have to get well first. That is the one great consideration. You have a good start, dont let anything interfere."

On December 10, 1940, she wrote to Miss Ellis in Chicago, expressing the hope that Judith was taking good care of her, and said:

"Now May if at any time you want to come home (back here is home) all you have to do is write to me and the fare will go to you by return mail—any way you want to go—except by flying— Don't do that—but I'll pay your fare or do anything you say . . . Dear girl come back—if only for a little while—yes?"

Again, in the same letter, she said:

"Remember, now, you are only away on a visit—when you want to come back—you come back to the money just as before—yours & mine both the same. Whats mine is yours whether in this house or some other—its ours together—I make no reservations with you—my dearest sister."

In the spring of 1941, while in the Puyallup general hospital, she wrote a letter asking that Ruth Wadleigh be sent to her for a few weeks, so that she would have someone to take care of her, thus enabling her to leave the hospital. She said:

"Nothing is changed between you & me. All you have to do is to write to me & let Ray know & we fix things up."

She also wrote that she was putting additional money to Miss Ellis's credit and urged her to take care of herself, and then, despite the fact that she had been begging that Ruth be sent to her, she concluded her letter by saying that Ruth was to stay in Chicago if May needed her.

In *In re Soles' Estate,* 215 Wis. 129, 253 N. W. 801, a parallel situation existed in that it involved a contract for the conveyance of an estate in exchange for care of the promisor until her death. During the absence of the promisee on a visit to Ireland, the promisor made a will in violation of the contract. The supreme court of Wisconsin held that the evidence justified the finding of the trial court that the visit of the promisee to Ireland was made pursuant to an

understanding on the part of the promisor and with her full knowledge and consent, and did not constitute a breach of the agreement, and that it was contemplated by both parties that the promisee should return and resume performance of her obligation under the contract. The court said:

"The agreement having been made, the deceased could not abrogate or disregard it, or terminate it without the consent of the claimant, and there is no evidence of such consent by claimant."

*Paulos v. Janetakos,* 41 N. M. 534, 72 P. (2d) 1, was an action to enforce an agreement to devise property to the plaintiff in exchange for personal services. The plaintiff served in the establishment of the promisor for seven years; he was then absent in Texas for two years; he returned and served again for four years; and then the promisor told him to leave. At about that time she married the defendant. She died two years thereafter and, by will, left all her property to the defendant. It was held that the promisor had consented to the plaintiff's absence for two years and that, as the proof of performance met the requirement of substantiality as against a demurrer to the evidence, the termination of his services by the promisor did not defeat his right to enforce the agreement of the promisor to devise her property to him. This was not a decision on the merits, but was a reversal of the lower court because it had erroneously sustained a demurrer to the evidence at the conclusion of the plaintiff's case.

█ It is our view that, by the letters which we have quoted, Mrs. Fletcher consented to the temporary absence of Miss Ellis and regarded the contract as being still in effect. Mrs. Fletcher could not abrogate, destroy, or terminate the contract without giving notice to Miss Ellis that she had revoked that consent and expected her to resume her duties under the contract. *Walker v. McMurchie,* 61 Wash. 489, 112 Pac. 500; *Lockit Cap Co. v. Globe Mfg. Co.,* 158 Wash. 183, 290 Pac. 813. There is no contention that such notice was ever given.

It is certain that Ruth Wadleigh did not want Miss Ellis
to return to Puyallup. A letter written by Ruth to Miss
Ellis and Judith, dated August 18, 1941, beginning with
the salutation, "Dear Folks," is most enlightening. She
stated that three hundred dollars was being sent them by
telegraph and then said:

"By the way—*no trips out here*
"Judith get this into your little *coconut*
"No trips nor visits
"I have enough on my hands
"*It will be good if you write exactly how little visiting
& traveling & excitement May can stand for a long time*
"Short visits short talks yes—half hour—
"Everything May has accomplished so far could be upset
& you fit for madhouse—all in sweetest stonewall way—"

It is apparent from this letter either that Ruth Wadleigh
knew that Miss Ellis (May) was not in condition to do any
visiting and traveling and wanted Mrs. Fletcher to be so
advised, or she wanted Mrs. Fletcher to believe that visiting
and traveling could upset everything that had been accom-
plished toward recovery by Miss Ellis, so that Mrs. Fletcher
would not be insisting on her sister's return to Puyallup.
Judith was apparently to be adamant, but sweet, in re-
fusing any requests by Mrs. Fletcher for Miss Ellis's return
to Puyallup. Certainly, in view of her attitude expressed
in this letter, Ruth Wadleigh cannot now be heard to say
that Miss Ellis should have returned and resumed her
duties.

Miss Ellis did return in June, 1942, with the intention
of again living with her sister. Appellant by that time
had a will in her favor and a contract, and we can well
believe the testimony of Judith Wadleigh that each day
the situation became more unpleasant. It was soon made
clear to Miss Ellis that she was not wanted. Judith Wad-
leigh's version of the final meeting between Mrs. Fletcher
and Miss Ellis was that Mrs. Fletcher said,

" 'May, go away; go way, May; you and Judith go away;
go to Rochester right away and stay there.' "

Ruth Wadleigh's version was that, with Miss Ellis leaning over the bed to see her sister, Mrs. Fletcher said:

" 'May, you are my sister. You are the one I invited to visit me. The visit is over. Take Judith and go back.' "

The only evidence to support appellant's present position that May Ellis could and should have stayed when she came out in June, 1942, is Ruth Wadleigh's testimony that, while visiting Miss Ellis in Tacoma, she told her that Mrs. Fletcher wanted her and asked her to stay, and that Miss Ellis replied, pointing to Judith, "I have to take care of her." We do not believe that such a conversation ever occurred. We are convinced that the last thing Ruth Wadleigh wanted was for Miss Ellis to remain near Mrs. Fletcher, and that it was Ruth's influence and attitude that changed Mrs. Fletcher from one who, a few weeks before, had written her sister asking her to come for a visit and saying:

"You can go back again as soon as you want to . . . Do come, 4 days and you are here— Come to your old pal Bean . . . Can't you come for a visit—only if for a few days? Then I can see you & know things are all right,"

to one who could tell her sister to go back to Rochester, or that "the visit is over."

■■ The refusal to permit Miss Ellis to remain with Mrs. Fletcher in June, 1942, could not deprive Miss Ellis of her right to have her contract enforced, she having rendered the services contemplated by the contract for sixteen years and her absence from July, 1940, to June, 1942, having been with the consent of Mrs. Fletcher. See *Paulos v. Janetakos, supra.* It is elementary that, where a contract has been substantially performed and an attempt to complete performance is refused, that refusal excuses any further attempts on the part of the party offering performance. *Brown v. Needles,* 186 Iowa 878, 170 N. W. 804.

Appellant's final argument is that Miss Ellis was estopped to assert that she had such a contract, because (1) she should have brought her action in Mrs. Fletcher's lifetime; (2) her acceptance of the monthly checks under the will was inconsistent with her claim that she was entitled to the entire estate; and (3) money which cannot be recovered

has been spent (referring, we assume, to the minor legacies and the inheritance tax).

■ The answer is very brief: Miss Ellis would have been obligated to resume her position in Mrs. Fletcher's home on demand, or forfeit her rights under the contract. There was no certain breach of the contract until Mrs. Fletcher's death. Miss Ellis had a right to wait and see what provision had been made for her in Mrs. Fletcher's will.

■ ■ It is clear that Miss Ellis refused to receive or use any of the money bequeathed to her by Mrs. Fletcher (although it was in the possession of her attorney) until Ruth Wadleigh, after this suit had been commenced, urged her to take and use the money. If there is any estoppel here, it is Ruth Wadleigh who should be estopped to assert such a defense. It may be that her delay in bringing this action may preclude Miss Ellis from questioning some of the disbursements by Ruth Wadleigh, as executrix, but those questions are not here before us and can be passed on only in the probate proceedings. The delay of less than a year after the death of Mrs. Fletcher in starting this action has not been a detriment to the appellant in preparing and presenting her defense. There has been no laches and there is no estoppel. *Conner v. Hodgdon,* 120 Wash. 426, 207 Pac. 675; *McCullough v. McCullough,* 153 Wash. 625, 280 Pac. 70.

There are some findings of fact of which appellant complains, such as the length of time Miss Ellis lived with Mrs. Fletcher, which vary somewhat from the actual testimony. The trial judge had no statement of facts from which to prepare his memorandum decision or findings, and none of these matters in any way affect the basic facts or the validity of the judgment predicated thereon.

There is no merit to the error assigned by reason of the trial court's refusal to admit appellant's proffered exhibits Nos. 23, 24, and 25. They were remote in time and immaterial. If it be conceded that Miss Ellis was financially embarrassed and in ill health in 1922, which apparently was the purpose for which these exhibits were offered, we would

still be of the opinion that her contract with Mrs. Fletcher was established beyond legitimate controversy.

Neither was there any abuse of discretion in the trial court's refusal to grant a new trial.

To give Ruth Wadleigh her due, it is undisputed that for two years and eight months, she did take care of Mrs. Fletcher, at a time and under conditions when that care was badly needed. She asks here no equitable relief, though by her second affirmative defense she apparently claims certain prior equities even though Miss Ellis should establish her contract. She apparently is satisfied, on this appeal, to stand on an all-or-nothing basis. In any event, it affirmatively appears that she has secured all and perhaps more than she was entitled to receive for the services rendered, so that there exists no reason, as there was in *Hesselgrave v. Mott*, 23 Wn. (2d) 270, 160 P. (2d) 521, to make the enforcement of the contract conditional.

The judgment of the trial court is affirmed.

MALLERY, C. J., STEINERT, ROBINSON, and JEFFERS, JJ., concur.

———

July 16, 1947. Petition for rehearing denied.