[No. 32677. *En Banc.* May 26, 1955.]

CHARLES BAUN, *Respondent,* v. LUMBER AND SAWMILL
WORKERS UNION, LOCAL NO. 2740
*et al., Appellants.*[1]

[1]Reported in 284 P. (2d) 275.

*Wettrick, Flood & O'Brien, George E. Flood,* and *George J. Toulouse, Jr.,* for appellants Lumber and Sawmill Workers Union *et al.*

*Kern, Dano & Cone* and *Nat U. Brown,* for appellants Ellensburg Lumber Company *et al.*

*Tonkoff, Holst & Hopp* and *Steensland & Smith,* for respondent.

HILL, J.—This is an appeal by all defendants from a judgment for ten thousand dollars based on the verdict of a jury in an action against a union, and certain members and officers thereof, and a corporation and its president, for a civil conspiracy to wrongfully procure the discharge of the plaintiff from his employment as superintendent of the sawmill belonging to the corporation.

The determination of this appeal has been long delayed, several opinions having been written in an effort to reconcile the diverse views of the members of the court on the jurisdictional issues involved, plus an almost equal diversity of views upon the merits.

An elaboration of the facts will be necessary to a consideration of the sufficiency of the evidence as against the various defendants, but for the presentation of the jurisdictional issues, suffice it to say that the Lumber and Sawmill Workers Union Local No. 2740, hereinafter called the union, voted to strike unless The Ellensburg Lumber Company, a corporation, hereinafter called the company, removed Charles Baun, hereinafter called the plaintiff, as superintendent of the company's sawmill. It is plaintiff's position that he was discharged by the company without cause by reason of this action of the union, and sustained substantial damages in consequence thereof. It is further his position that there was a conspiracy between the union and its members and the company and the company's president to bring about his discharge. It is urged by the union and its members that the plaintiff is complaining of an unfair labor practice for which the national labor relations board will give such relief as he may be entitled to have, and that its jurisdiction is exclusive.

We do not agree that the state's jurisdiction to deal with this controversy has been superseded by the labor management relations act, 1947 (29 U.S.C.A. 1952 ed., § 141 *et seq.*), because we do not believe the action of either the union or the company constitutes an unfair labor practice within the purview of that act.

The language relied on in this connection is that part of 29 U.S.C.A. 1952 ed., § 158 (b), which reads as follows:

"It shall be an unfair labor practice for a labor organization or its agents—

" . . .

" (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section . . . "

The material part of subsection (a) (3) of § 158 reads as follows:

"It shall be an unfair labor practice for an employer—

" . . .

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment *to encourage or discourage membership in any labor organization*: . . . " (Italics ours.)

It is not contended that the plaintiff was discharged "to encourage or discourage membership in any labor organization." Consequently, the union's activities in causing the company to discharge him, or the company's act in discharging him did not constitute an unfair labor practice within the meaning of the quoted portions of § 158 (a) or (b).

Moreover, it will be noted that § 158 (b) pertains to acts of discrimination against an "employee." Under § 152 (3) of the act, defining the term "employee", any individual employed as a supervisor is specifically excluded. It is conceded that the plaintiff was employed as a sawmill and box factory superintendent, and that he must, of necessity, be regarded as a supervisor.

It has been suggested that *National Labor Relations Board v. Talladega Cotton Factory,* 213 F. (2d) 209, is authority for the proposition that supervisory personnel have the remedy of reinstatement and back pay under the Federal act when discharged as the result of an unfair labor practice. We do not so construe the *Talladega* case, as the supervisors were not there reinstated for the protection of their *own* rights, but rather to protect the rights of the rank and file. The court there said:

"*Though the Board concededly has no authority, statutory or otherwise, to reinstate supervisors as 'employees' to redress their private grievance and penalize respondent,* we see no reason why the Board, in the exercise of its statutory discretion, does not have the same remedial power to redress acts of indirect interference and restraint of ordinary employees through discharge of supervisors." (Italics ours.) (p. 217)

■ We are satisfied that neither the union and its members, nor the company, were guilty of an unfair labor practice within the meaning of 29 U.S.C.A. 1952 ed., § 158 (a) or (b), and that the plaintiff has no remedy before the national labor relations board.

But it is urged that even if the plaintiff has no remedy under the Federal statute referred to, he still cannot maintain an action for relief in any court because the act of the union and its members was a "concerted activity" for the purpose of "mutual aid or protection", within the meaning of 29 U.S.C.A. 1952 ed., § 157, and as such, they are protected from restraint or compensatory relief in any form.

■ Surely, a supervisor who has no remedy under the labor management relations act is entitled to have determined whether the act of the union which brought about his discharge was for the purpose of "mutual aid or protection", or whether its action was malicious and without just cause or excuse.

In *DeMinico v. Craig* (1911), 207 Mass. 593, 94 N. E. 317, 42 L. R. A. (N.S.) 1048, it is said in the syllabus:

"A labor strike to get rid of a foreman because some of the workmen under him have a dislike for him is not a strike for a legal purpose."

In that case, Judge Loring said:

"The plaintiff had a right to work and that right of his could not be taken away from him or interfered with by the defendants unless it came into conflict with an equal or superior right of theirs. The defendants' right to better their condition is such an equal right. But to humor their personal objections, their likes and dislikes, or to escape from what 'is distasteful' to some of them is not in our opinion a superior or an equal right.

"It is doubtless true that in a certain sense the condition of workmen is better if they work under a foreman for whom they do not have a personal dislike, that is to say, one who is not 'distasteful' to them. But that is not true in the sense in which those words are used when it is said that a strike to better the condition of the workmen is a strike for a legal purpose. One who betters his condition only by escaping from what he merely dislikes and by securing what he likes does not better his condition within the meaning of

those words in the rule that employees can strike to better their condition."

■ We recognize that the opinion just quoted dates back to 1911, long prior to enactment of Federal legislation of the character with which we are here concerned, but whether it is called the "right to better their condition", as in that opinion, or "mutual aid or protection", as in the labor management relations act, the employees who are trying to force the discharge of a foreman or superintendent must have some better reason than an arbitrary and capricious desire to get rid of him, or to enforce their will on an employer. See *Barile v. Fisher* (1949), 197 Misc. 493, 94 N. Y. S. (2d) 346.

We concede *arguendo* that if the union and its members proved that their concerted activities in this case were for the purpose of "mutual aid or protection," that would be a defense to the present action, but we do not believe that it was ever intended that a discharged supervisor or superintendent should be deprived of a forum wherein it could be determined whether the action of the union and its members in interfering with his contract of employment was justified, and hence lawful, or unjustified, and hence unlawful. In short, 29 U. S. C. A. 1952 ed., § 157 is a shield to defend labor and labor organizations when their concerted activities are within the scope of that section, but it is not an immunity bath for capricious and unjustifiable imposition of their will on an employer.

■ ■ We conclude that, there being no unfair labor practice involved, the national labor relations board has no jurisdiction to give the plaintiff any relief, and we conclude, further, that the labor management relations act was not intended to and does not bar an action against a union and its members for tortious conduct in interfering with a contract of employment where that conduct is not in furtherance of their "mutual aid or protection."

■ Further, we put our conclusion that the Washington courts have jurisdiction of the subject matter of this litigation on the still broader base that the traditional jurisdiction of a state court to enforce a common-law tort lia-

bility has not been removed, *at least in such a case as the present,* by the labor management relations act, even though the tortious conduct constitutes an unfair labor practice under the act.

In considering this phase of the jurisdictional question, it is well to note at the outset *what the plaintiff is not asking.*

He is not asking that any activities of the union or its members, or that any action by the company be restrained or enjoined; he is not asking that he be reinstated in his position, nor is he asking for back pay. He is not claiming that he is or was an employee within the purview of the labor management relations act.

He accepts as *fait accompli* his discharge as superintendent of the company's mill. He alleges that his discharge was achieved in connection with and by means of an unlawful conspiracy, and that the union and its members, without cause or justification, caused his discharge by a threat to strike. His common-law action for unlawful interference with his employment or for conspiracy to unlawfully interfere with his employment, and his right to damages therefor, differs from any remedy which the national labor relations board has power to provide, and *it does not involve any question of present or future relations between the company and himself, or the company and its other employees.*

That the state courts have traditionally granted compensatory relief in the form of damages in such cases cannot be denied. See annotations in 26 A. L. R. (2d) beginning at page 1227, and particularly § 44 at page 1273, and § 49 at page 1284. *Kuzma v. Millinery Workers Union Local No. 24* (1953), 27 N. J. Super. 579, 99 A. (2d) 833; *Kinane v. Fay* (1933), 111 N. J. L. 553, 168 Atl. 724; *Brennan v. United Hatters of North America, Local No. 17* (1906), 73 N. J. L. 729, 65 Atl. 165, 118 Am. St. 727, 9 L. R. A. (N. S.) 254, 9 Ann. Cas. 698; *Bausbach v. Reiff* (1914), 244 Pa. 559, 91 Atl. 224, L. R. A. 1915D, 785; *Dukes v. Brotherhood of Painters, Decorators & Paperhangers of America, Local Union*

*No. 437* (1950), 191 Tenn. 495, 235 S. W. (2d) 7, 26 A. L. R. (2d) 1223.

The opening paragraph of the opinion in *United Const. Workers v. Laburnum Const. Corp.* (1954), 347 U. S. 656, 98 L. Ed. 1025, 74 S. Ct. 833, makes it as clear as it can be made by the use of the English language that the fact that certain conduct constitutes an unfair labor practice and is, therefore, within the jurisdiction of the national labor relations board, does not necessarily preclude a common-law tort action in the appropriate state court for the same conduct. We quote the language of that paragraph:

"The question before us is whether the Labor Management Relations Act, 1947, has given the National Labor Relations Board such exclusive jurisdiction over the subject matter of a common-law tort action for damages as to preclude an appropriate state court from hearing and determining its issues where such conduct constitutes an unfair labor practice under that Act. For the reasons hereafter stated, we hold that it has not."

The principal reason "hereafter stated", as we read the *Laburnum* opinion (and an article in 30 Wash. L. Rev. 1, suggests that there are several ways to read it), is that in the labor management relations act, Congress has

". . . neither provided nor suggested any substitute for the traditional state court procedure for collecting damages for injuries caused by tortious conduct. For us to cut off the injured respondent from this right of recovery will deprive it of its property without recourse or compensation. To do so will, in effect, grant petitioners immunity from liability for their tortious conduct. We see no substantial reason for reaching such a result. The contrary view is consistent with the language of the Act and there is positive support for it in our decisions and in the legislative history of the Act."

Certiorari was granted in the *Laburnum* case "Because of the importance of the jurisdictional issue to the enforcement of common-law rights and to the administration of the Labor Management Relations Act, . . ." We recognize that certiorari was granted limited to the following question:

" ' "In view of the *type of conduct* found by the Supreme Court of Appeals of Virginia to have been carried out by

Petitioners, does the National Labor Relations Board have exclusive jurisdiction over the subject matter so as to preclude the State Court from hearing and determining the issues in a common-law tort action based upon this conduct?" ' " (Italics ours.)

We agree that the *Laburnum* case must be read with the "type of conduct" on the part of the offending union in mind. It involved a stoppage of work brought about by intimidation and threats of violence, backed up by a "very rough, boisterous crowd," some of the members of which were carrying guns and knives. This was to enforce the defendant union's demands that all employees join that union and that it be recognized as their exclusive bargaining agent. The work stoppage caused Laburnum to lose certain construction contracts and to sustain substantial damages in consequence thereof. This is given emphasis in the concluding paragraph of the opinion, which reads:

"If Virginia is denied jurisdiction in this case, it will mean that where the federal preventive administrative procedures are impotent or inadequate, the offenders, by coercion of the type found here, may destroy property without liability for the damage done. If petitioners were unorganized private persons, conducting themselves as petitioners did here, Virginia would have had undoubted jurisdiction of this action against them. The fact that petitioners are labor organizations, with no contractual relationship with respondent or its employees, provides no reasonable basis for a different conclusion."

This leaves open the question of what other "type of conduct" warrants state court action and relief.

In concluding our discussion of the jurisdictional question, we would call attention to the case of *Kuzma v. Millinery Workers Union, supra,* which is squarely in point with our present controversy. In that case, the union asked for a voluntary contribution to procure a gift for one of its officials. Mrs. Kuzma, a member of the union, refused to make such a contribution. The union, through its agents, informed her employer that no union member would work in the shop until she was discharged. The employer discharged her. She and her husband sued for damages, alleging that she

was unable to obtain further employment in the industry, and suffered wage losses, humiliation, mental and nervous anguish, *et cetera.*

The trial court dismissed the case upon the grounds that the cause of action pleaded constituted an unfair labor practice under the national labor relations act, and that the national labor relations board had exclusive jurisdiction. The superior court of New Jersey, appellate division, concluded that the national labor relations act, as amended in 1947, did not deprive the courts of that state of jurisdiction of the tort action. We quote at some length to make clear the basis of that conclusion:

"The notion that the traditional jurisdiction of the state court to enforce a common-law tort liability, has been removed by this federal enactment because the conduct constitutes an unfair labor practice as well, is as startling as it is novel. There is certainly no express declaration by Congress of such supersedure. And in the absence thereof, plainly the State should not yield its sovereignty unless the intention to preempt and occupy the field is an inescapable conclusion from the language employed. This approach is not a mere manifestation of a chauvinistic desire for the perpetuation of state control but rather a recognition of a principle long since established by the United States Supreme Court."

The opinion then quotes at length from *Texas & Pac. R. Co. v. Abilene Cotton Oil Co.* (1907), 204 U. S. 426, 51 L. Ed. 553, 557, 27 S. Ct. 350, to establish the principle that a statute will not be construed as taking away a common-law right,

" ' . . . unless it be found that the pre-existing right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory.' "

After citing *California v. Zook* (1949), 336 U. S. 725, 733, 93 L. Ed. 1005, 69 S. Ct. 841, to the same effect, the New Jersey court continues:

"Is there any such repugnancy here as would justify or require the conclusion we are asked to reach? Obviously if it were not for the provision relating to the assessment of back·wages, the proposal would not have even the appearance of some substance. But in our judgment, the possi-

bility, or even the probability, of an award of back wages in a case like the one before us, does not create the resounding collision between the federal act and the jurisdiction of our courts to redress the tort, which is a prerequisite to supersedure."

And so say we.

Irrespective of how the holdings in the *Laburnum* case may be expanded (see *Benjamin v. Foidl* (1954), 379 Pa. 540, 109 A. (2d) 300 and *Wortex Mills v. Textile Workers Union of America* (1954), 380 Pa. 3, 109 A. (2d) 815) or limited, it necessarily answers the contention of the defendants in the present case that the state court would have no jurisdiction if the tortious conduct complained of was also an unfair labor practice. It is clear that there are "types of conduct" where a state court would have jurisdiction. We are satisfied, further, that there is no "resounding collision" or conflict between the relief sought here and any provisions of the labor management relations act, either in procedure or in purpose. The "type of conduct" which we have outlined, together with the fact that the plaintiff has placed himself entirely beyond the periphery of labor management relations, indicates that there is no substantial reason for denying him his traditional state court procedure for collecting damages, if he be entitled thereto.

We come now to the merits of the controversy, and are confronted with the necessity of determining the sufficiency of the evidence against the various defendants.

We recognize that, as a general rule, on a challenge to the sufficiency of the evidence to sustain a verdict and a judgment predicated thereon, the evidence is to be interpreted in the light most favorable to the plaintiff, and he is entitled to all the reasonable inferences that might be drawn therefrom. *Myers v. Little Church by the Side of the Road* (1951), 37 Wn. (2d) 897, 905, 227 P. (2d) 165. Some limitation of this rule is to be noted in civil conspiracy cases where it is sought to establish the conspiracy by circumstantial evidence. While it is recognized that a conspiracy may be, and usually must be, proved by acts and circumstances sufficient to warrant an inference that the defend-

ants have reached an agreement to act together for the purpose alleged, the test of the sufficiency of the evidence is that the facts and circumstances relied upon to establish the conspiracy must be inconsistent with a lawful or honest purpose and reasonably consistent only with the existence of the conspiracy. As stated in *Harrington v. Richeson* (1952), 40 Wn. (2d) 557, 245 P. (2d) 191:

"Where the facts and circumstances relied upon to establish a conspiracy are as consistent with a lawful or honest purpose as with an unlawful undertaking, they are insufficient."

The cases there cited in support of that statement were *Quackenbush v. Slate* (1942), 12 Wn. (2d) 201, 121 P. (2d) 331; *Federal Land Bank v. McMinimee* (1938), 193 Wash. 321, 75 P. (2d) 138; *Hair v. Old Nat. Ins. Agency* (1935), 184 Wash. 477, 51 P. (2d) 398; *Dart v. McDonald* (1919), 107 Wash. 537, 182 Pac. 628; *Dunlap v. Seattle Nat. Bank* (1916), 93 Wash. 568, 161 Pac. 364.

Contrary to the contention of the plaintiff, this rule has not been limited to actions involving a conspiracy to defraud. We applied it in *Hair v. Old Nat. Ins. Agency, supra,* which was a conspiracy to procure cancellation of a contract, and it has been applied in other jurisdictions on many occasions. *Fife v. Great Atlantic & Pac. Tea Co.* (1947), 356 Pa. 265, 52 A. (2d) 24; *Rosenblum v. Rosenblum* (1935) 320 Pa. 103, 181 Atl. 583; *Nissen v. Andres* (1936), 178 Okla. 469, 63 P. (2d) 47; *Goble v. American R. Express Co.* (1923), 124 S. C. 19, 115 S. E. 900; *Gager v. Reeves* (1950), 235 S. W. (2d) (Tex. Civ. App.) 688.

So that there can be no question as to the acts the plaintiff deems to be favorable to him and sufficient to establish the conspiracy, we quote the statement of what the jury was entitled to believe from the respondent's (plaintiff's) brief: (The numerals [1] and [2] appearing in the quotation are ours and were inserted for the purpose of calling attention to statements that require amplification or qualification to which reference will hereafter be made.)

"The jury was entitled to believe, and by its verdict did believe, that the plaintiff was a man easy to work with;

that he had a good safety record, and that he was a satisfactory superintendent; that four complaints had been made about him, but that he was getting along alright with the Union, and that it was uncontroverted that the defendant Union threatened to strike to compel his removal as superintendent.

"That the defendant company and Sinclair acted in accord [1] with the defendant Union's demands, although it was admitted that no immediate loss would be caused, and upon being informed of the Union's demands of April 17th and 18th, Mr. Baker, the assistant manager of defendant company, asked ten days in which to replace plaintiff. The company, through its president, Sinclair, told the plaintiff on April 30, 1951 that he was to be off the premises by 5:00 o'clock that evening; that the defendant company and Sinclair, despite their claim to have backed plaintiff one hundred percent, delivered the ultimatum to the plaintiff notwithstanding the admitted fact that the company and Sinclair were entirely satisfied with plaintiff as an employee as of the time he left the company's employment. That about the time of plaintiff's discharge, the defendant Union's president told Sinclair that he, Sinclair, would have to stick by the Union or there would be a $100,000 lawsuit, and that Sinclair wrote a letter to the plaintiff stating that the Union had demanded his discharge and listed other reasons why he would not be reemployed, even though plaintiff did not ask for his job back. The defendant Sinclair had a special interest in seeing plaintiff discharged, as he had promised him $5,000 if he stayed in the company's employ, and Sinclair took steps to save this [2] when plaintiff was discharged . . ."

The plaintiff follows this with a conclusion, and with the italicized portion thereof we cannot agree:

". . . Certainly this evidence constitutes a showing that the defendant Union members conspired to and did take action to wrongfully interfere with and bring about the termination of plaintiff's employment, and *that the company and Sinclair joined with them* in accomplishing their ultimate purpose."

The word "accord" [1], as used in the quoted statement, is misleading unless given the meaning of "in accordance with," or "in compliance with." There is absolutely no evidence of any "accord" in the sense of a meeting of the minds or of an agreement between the members and officers

of the union and the lumber company and the defendant O. W. Sinclair, the president of the company, to accomplish any of the alleged objectives of the conspiracy, except the fact that the plaintiff was discharged.

The statement in the quoted portion of the respondent's brief implying that Sinclair was influenced by a desire to "save" [2] the five thousand dollars he had promised the plaintiff "if you stay here until I leave the mill," has no support in the evidence. It should be pointed out that Sinclair had included a five thousand dollar bequest to the plaintiff in his will executed on May 15, 1950, which remained there for more than fourteen months after the plaintiff was discharged and was not changed until August 7, 1952, which was after the plaintiff had made Sinclair a party to this action, asking damages against him in the sum of $55,690.

The trial court instructed the jury that before it could find The Ellensburg Lumber Company or O. W. Sinclair liable as conspirators, it must find that they entered into an agreement to accomplish one or more of the objects of the conspiracy with the union, i. e., (a) to secure the plaintiff's discharge; (b) to prevent his securing similar or suitable employment; or (c) to prevent his fulfilling his agreement with Sinclair, which was a condition precedent to receiving the five thousand dollars promised him by Sinclair.

We have combed this record very carefully, and there is no evidence which even inferentially ties the company and Sinclair into an agreement with the union to prevent the plaintiff from securing similar or suitable employment (b); and the record is completely devoid of any evidence which ties any party into an agreement to prevent the plaintiff from receiving the five thousand dollars promised him by Sinclair (c). With reference to (c), there is no evidence that anybody knew that there was such a promise by Sinclair to the plaintiff except the two of them, and their versions of the promise differed materially. It is our view that there can be no conspiracy to deprive the plaintiff of the

benefit of a promise, when it is conceded that only one of the alleged conspirators had any knowledge thereof.

While proof concerning the alleged promise of five thousand dollars from Sinclair to the plaintiff was admissible as providing a motive for Sinclair's joining the conspiracy to achieve object (a), there is no justification for considering it as a separate object of a conspiracy. (This five thousand dollars is apparently conceded by all parties to be a proper element of damages as no assignment of error is directed against the instruction which made it an item recoverable from all defendants.)

While all of the defendants claimed that the plaintiff quit, and was not discharged, the trial court instructed the jury that, if it found that the plaintiff had quit, it was to bring in a verdict for the defendants. The jury consequently must have found that the plaintiff was discharged.

Insofar as the company and Sinclair are concerned, there remains but one question, Did they join with the union in a conspiracy to achieve object (a), *i. e.*, the discharge of the plaintiff?

The testimony is undisputed, and the plaintiff, in his statement of the evidence which he urges as sufficient to sustain the verdict, concedes that the company and Sinclair were entirely satisfied with the plaintiff at the time his employment was terminated. The plaintiff, himself, testified that his understanding with Sinclair was that either would give the other thirty days' notice of termination of employment. He testified further that he asked for the extra month's pay, which it is conceded he received when he was discharged, and that he got it after he told Richard W. Parrish, the general manager for the company, about his "deal" with Sinclair. On cross-examination, he testified that he did not know whether he had to ask for the extra month's pay.

If the conclusion that the lumber company and Sinclair conspired with the union and its members to secure the discharge of the plaintiff is an inference that can be drawn from the facts relied upon by the plaintiff (and we are unable to draw such an inference), there is a much more rea-

sonable inference that the lumber company and Sinclair yielded to the coercion of the union and, under that pressure, discharged a superintendent with whom they were entirely satisfied. Their acts are entirely consistent with a yielding to such compulsion and, as previously emphasized, there is no evidence to connect them directly with any conspiracy. We have heretofore discussed the rule to be applied to determine the sufficiency of the evidence to establish a civil conspiracy by circumstantial evidence, and the evidence as to the company and Sinclair does not meet the test.

There remains but one theory on which the company and Sinclair can be guilty of conspiring with the union, and that is that by merely yielding to coercion and discharging the plaintiff, they became active participants in the conspiracy to bring about that discharge.

The position that the company and Sinclair are liable as conspirators if, under the compulsion of a threat to strike, they discharged their mill superintendent without other cause, finds support in certain cases to which reference is made in an opinion by the Honorable Joseph A. Richardson, judge of the court of common pleas for Allegheny county, Pennsylvania, reported in 52 A. (2d) 24 and adopted by the supreme court of Pennsylvania in *Fife v. Great Atlantic & Pac. Tea Co.* (1947), 356 Pa. 265, 52 A. (2d) 24, 38 (certiorari denied, 332 U. S. 778, 92 L. Ed. 362, 68 S. Ct. 42). But we, like the Pennsylvania courts in that case, prefer to hold that to establish an actionable conspiracy there must be "a breathing together [the literal meaning of "conspiracy"], or combination acting in unison toward a common objective."

In *Harrington v. Richeson* (1952), 40 Wn. (2d) 557, 245 P. (2d) 191, we laid down the rule that before a person can be liable as a conspirator, the evidence must show that he entered into an agreement with other conspirators to accomplish an object of the conspiracy. See, also, *Dart v. McDonald* (1919), 107 Wash. 537, 182 Pac. 628.

Our own case of *Eyak River Packing Co. v. Huglen* (1927), 143 Wash. 229, 255 Pac. 123, 257 Pac. 638, is included in the *Fife* case, *supra,* as supporting the theory of a coerced con-

spiracy, but while that case holds that all members of a conspiracy do not need to join it at the same time, which is unquestionably true, there is nothing in it which conflicts with our holding as to what is necessary to constitute a conspiracy.

We conclude that there was no basis on which the jury could have found that the company and Sinclair had entered into a conspiracy to cause plaintiff to be discharged, and that the action, as to them, must be dismissed.

(This is not an action for breach of contract against Sinclair on the five thousand dollar item, and the question of any liability by reason of his having made it impossible for the plaintiff to fulfill the conditions precedent to his securing the five thousand dollars is not in this case. See *Ellis v. Wadleigh* (1947), 27 Wn. (2d) 941, 182 P. (2d) 49.)

There remains the question of whether there was evidence of a conspiracy between the union, its members and officers, to cause the discharge of plaintiff without any justifiable reason therefor. (Actually, with the elimination of the company and Sinclair from the case, conspiracy ceases to be an important element in this lawsuit. It is seemingly immaterial whether the plaintiff was seeking recovery against the union and its members for unlawful interference with his contract of employment, or whether he was seeking recovery for their conspiracy to accomplish the same result. See *Goble v. American R. Express Co., supra.* The theory of the plaintiff's original complaint in this action against the union and its members was an unlawful interference with his contract of employment, the conspiracy element being added when the company and Sinclair were made defendants.)

It is conceded that the union voted on April 17, 1951, to strike unless the plaintiff was removed as superintendent, and they so advised the company on April 18th, and the union and its members continued to insist, particularly at a meeting with officers of the company on April 30th, that the plaintiff be discharged before May 1st, and he was discharged on April 30th. Plaintiff testified that there had been no complaints made to him and that he knew of no reason

for such action on the part of the union and its members. As we have previously conceded *arguendo,* if this concerted activity of the union and its members was "for the purpose of . . . mutual aid and protection", it was a defense to this action.

The union members attempted to justify the action taken by testimony relative to unsafe conditions about the mill, of which the plaintiff knew and some of which he did not remedy, and others of which were remedied somewhat tardily. Four written complaints against him were filed with the company, apparently in an effort to comply with the union agreement relative to the making of complaints in writing. All this raised an issue of fact as to whether the union members acted for the purpose of their mutual aid and protection in an effort to secure safe working conditions in the sawmill, or whether they acted arbitrarily and without justification.

We are satisfied that there was a case for the jury on either the theory of an unlawful interference with the plaintiff's contract of employment, or of a conspiracy to consummate the same purpose.

The trial court did submit the issue of justification to the jury, but in a manner which the union and its members contend, and which we agree, was erroneous. The jury was instructed:

"If you find from all of the evidence that the motive and purpose of the defendant union and its members in this case in threatening to strike, was for the purpose of their mutual aid and protection and to secure safe working conditions at their employers Sawmill, *and not for the purpose of causing the discharge of the plaintiff,* then you are instructed to find a verdict for all of the defendants herein." (Italics ours.)

Had the italicized words been omitted, as they were in the instruction proposed by the union and its members, it would have been a proper instruction. Had the word "primarily" been inserted after the word "not", as requested by appellants, their objections would have been met. It seems to us that the italicized words deprived the union and its members of the defense that its acts were justified. The

instruction required an impossible finding that the threatened strike was not for the purpose of causing the discharge of the plaintiff as a prerequisite to a verdict for the defendants, even if the jury found that the threatened strike was for the purpose of the mutual aid and protection of the union and its members. It was at all times conceded that the strike was threatened for the purpose of causing the discharge of the plaintiff, and that was its acknowledged objective.

This erroneous instruction was sufficiently prejudicial to warrant a new trial for the union and its members.

Other assignments of error relative to instructions are either without merit or relate to instructions concerning defendants who, we have held, were entitled to a judgment of dismissal, and such instructions would not be given again in the event of a new trial limited to the union and its members.

Still another assignment of error relates to the liability of the members of the union, named as defendants. No attempt is made in behalf of any individual defendant to show wherein the evidence against him is not sufficient to sustain the verdict and the judgment based thereon, but the argument presented is that no union member can be liable as an individual. The law unquestionably is that in such a case as this the officers and members of a union or other similar unincorporated association are liable for acts which they individually commit or participate in or authorize or assent to or ratify. *Wortex Mills v. Textile Workers Union of America* (1954), 380 Pa. 3, 109 A. (2d) 815, and cases therein cited. See, also, *Furniture Workers Union Local 1007 v. United Brotherhood of Carpenters & Joiners of America* (1946), 6 Wn. (2d) 654, 108 P. (2d) 651; also *Arnold v. National Union of Marine Cooks & Stewards Ass'n* (1950), 36 Wn. (2d) 557, 219 P. (2d) 121 and (1954) 44 Wn. (2d) 183, 265 P. (2d) 1051, where individual liability is assumed.

We find no merit in the contention that the labor management relations act (29 U. S. C. A. §§ 185 and 187) does not permit a judgment against the individual union member. What the statute relied on says (and it is limited to money

judgments in district courts of the United States) is that a judgment against a labor organization shall not be enforcible against its members, which is a far cry from saying that a judgment cannot be recovered against individual members in consequence of their individual actions. The argument is a complete *non sequitur*.

The judgment against The Ellensburg Lumber Company and O. W. Sinclair is reversed, with instructions to enter a judgment of dismissal, and they will recover their costs herein. The judgment against the union and the members thereof is reversed, with instructions to grant a new trial, with costs to abide the result.

HAMLEY, C. J., MALLERY, SCHWELLENBACH, and DONWORTH, JJ., concur.

WEAVER and FINLEY, JJ., concur in the result.

---

August 2, 1955. Petition for rehearing denied.